**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| UNITED STATES OF AMERICA *ex rel.* JAN DOE,<br>Care of Law Office of Lawrence J. Joseph<br>1250 Connecticut Avenue NW, Suite 200<br>Washington, DC 20036,<br>Plaintiff and Relator,<br>v.<br>HCA HOLDINGS, INC., *d.b.a.* HCA – HOSPITAL CORPORATION OF AMERICA and HOSPITAL CORPORATION OF AMERICA,<br>1 Park Plaza<br>Nashville, TN 37203,<br>HCA PHYSICIAN SERVICES, INC.,<br>1 Park Plaza<br>Nashville, TN 37203,<br>HENDERSONVILLE HOSPITAL CORPORATION *d.b.a.* HENDERSONVILLE MEDICAL CENTER,<br>1 Park Plaza<br>Nashville, TN 37203,<br>HTI MEMORIAL HOSPITAL CORPORATION *d.b.a.* SKYLINE MEDICAL CENTER,<br>1 Park Plaza<br>Nashville, TN 37203,<br>and<br>GASTROENTEROLOGY & HEPATOLOGY ASSOCIATES, PLLC,<br>107 Glen Oak Boulevard, Suite 202<br>Hendersonville, TN 37075,<br>Defendants. | Civil Action No. ___-_________<br><br>**FILED UNDER SEAL**<br>**pursuant to 31 U.S.C. §3730(b)(2)** |

**COMPLAINT FOR VIOLATIONS OF FEDERAL FALSE CLAIMS ACT**

On behalf of the United States, relator Jan Doe ("Relator") brings this action under the False Claims Act, 31 U.S.C. §§3729-3733, against defendants HCA Holdings, Inc., HCA

Physician Services, Inc., Hendersonville Hospital Corp., HTI Memorial Hospital Corp., and Gastroenterology and Hepatology Associates, PLLC (collectively, hereinafter "Defendants"), for violations of the Medicare program, 42 U.S.C. §§1395-1395kkk-l, the Stark Law, 42 U.S.C. §1395nn, and the Anti-Kickback Statute, 42 U.S.C. §1320a-7b(b), based on the following allegations.

## NATURE OF THE ACTION

1. As set forth more fully herein, Relator seeks to recover federal funds unlawfully claimed and held by Defendants in violation of the False Claims Act.

2. As required by 31 U.S.C. §3730(b)(2), relator will serve the United States Attorney General and the United States Attorney for the District of Columbia with copies of this complaint along with a written disclosure of material evidence related to the complaint. The disclosure statement supports the allegations herein of false claims against the United States by the defendants.

3. As required by the False Claims Act, this complaint is being filed under seal and shall not be served on the defendants until the Court so orders.

## PARTIES

4. The United States is the real party in interest. Through the Department of Health & Human Services ("HHS") and the Centers for Medicare and Medicaid Services ("CMS"), the United States provides health care to its citizens through the Medicare and Medicaid programs.

5. Contemporaneously with the filing of this Complaint, Relator is moving the Court for leave to proceed pseudonymously. To Relators' knowledge, the allegations herein have not been disclosed: in a federal proceeding in which the Federal Government is a party; in a Government Accountability Office, or other Federal report, hearing, audit, or investigation; or in

the news media. Further, Relator is an "original source" of the allegations herein, as that term is defined in 31 U.S.C. §3730(e)(4)(B).

6. Defendant HCA Holdings, Inc. ("HCA") is a Delaware corporation, headquartered in Nashville, that operates for-profit health care facilities. HCA does business under the assumed names "HCA – Hospital Corporation of America" and "Hospital Corporation of America." HCA manages approximately 170 hospitals and 110 freestanding surgical centers in the United States and the United Kingdom. As explained in Paragraph 93, *infra*, HCA is a serial violator of the False Claims Act and has paid well more than a billion dollars in criminal and civil penalties for violating the False Claims Act.

7. Defendant HCA Physician Services, Inc. is a Tennessee corporation and wholly owned subsidiary of defendant HCA. As a part of the HCA network, HCA Physician Services focuses on implementing value-added physician solutions for HCA.

8. Defendant Hendersonville Hospital Corporation is a Tennessee corporation and a subsidiary of defendant HCA doing business under the assumed name "Hendersonville Medical Center." Hendersonville Medical Center manages a hospital located at 355 New Shackle Island Road, Hendersonville, Tennessee 37075.

9. Defendant HTI Memorial Hospital Corporation is a Tennessee corporation and a subsidiary of defendant HCA doing business under the assumed name "Skyline Medical Center." Skyline Medical Center manages a hospital located at 3441 Dickerson Pike, Nashville, Tennessee 37207.

10. Defendant Gastroenterology & Hepatology Associates, PLLC ("GHA") is a Tennessee professional limited liability company operating a medical practice in Hendersonville, Tennessee.

## JURISDICTION AND VENUE

11. This action arises out of Defendants' ongoing violations of the federal Medicare, Stark, AKS, and False Claims Acts, and, therefore, raises federal questions over which this Court has jurisdiction pursuant to 28 U.S.C. §1331.

12. Pursuant to 31 U.S.C. §3732(a), venue is proper in this Court because Defendants actively recruited and contracted with Dr. William E. Norris while he was stationed at Walter Reed Army Medical Center in Washington, D.C. and because the false claims prohibited by 31 U.S.C. §3729 were submitted to the federal government in Washington, D.C.

13. An actual and justiciable controversy exists between plaintiff United States and the Defendants.

## STATUTORY AND REGULATORY FRAMEWORK

14. The following subsections identify the pertinent laws and regulations relevant to this action. Unless otherwise stated, the cited laws and regulations were in effect unchanged in any material respect for the period covered by this Complaint (namely, 2011 to the present).

### False Claims Act

15. The False Claims Act, 31 U.S.C. §§3729-3733 ("FCA"), prohibits the submission of false or fraudulent claims and false statements in order to obtain or keep federal money.

16. As amended by the Fraud Enforcement and Recovery Act of 2009, the False Claims Act creates civil liability for any person who:

> (A) knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval;
>
> (B) knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim;
>
> (C) conspires to commit a violation of subparagraph (A), (B), (D),

> (E), (F), or (G);
>
> . . .
>
> (G) knowingly makes, uses, or causes to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the Government, or knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the Government, . . .

31 U.S.C. §3729(a)(1). The terms "knowing" and "knowingly" in the statute "mean that a person, with respect to information – (i) has actual knowledge of the information; (ii) acts in deliberate ignorance of the truth or falsity of the information; *or* (iii) acts in reckless disregard of the truth or falsity of the information" and "require no proof of specific intent to defraud." 31 U.S.C. §3729(b)(1)(A)-(B) (emphasis added).

17. The civil penalties for FCA violations are set by statute and adjusted for inflation pursuant to the Federal Civil Penalties Inflation Adjustment Act of 1990, (codified as amended at 28 U.S.C. 2461 note 2(a)), as amended by the Federal Civil Penalties Inflation Adjustment Act Improvements Act of 2015, Pub. L. No. 11-74, §701, 129 Stat. 584, 599-601 (2015) ("FCPIA"); *see also* 28 CFR §85.3(a)(9).

**Medicare**

18. In 1965, Congress enacted Title XVIII of the Social Security Act, known as the Medicare program, to pay for the costs of certain health care services. Entitlement to Medicare is based on age, disability, or affliction with end-stage renal disease. *See* 42 U.S.C. §§426, 426a. Although the Medicare program has four parts, only Medicare Parts A and B are relevant here.

19. Medicare Part A authorizes payment for institutional care, including hospital, skilled nursing facility and home health care. *See* 42 U.S.C. §§1395c-1395i-4. Most hospitals, including all of the HCA's U.S.-based hospitals, derive a substantial portion of their revenue

from Medicare.

20. Medicare Part B authorizes payment for, among other things, outpatient hospital services. 42 U.S.C. §§1395k(a), 1395l(t), and (as a federally subsidized, voluntary insurance program) covers a percentage of the fee schedule amount of physician and laboratory services. 42 U.S.C. §§1395k, 13951, 1395x(s).

21. HHS is responsible for the administration and supervision of the Medicare program. CMS is an agency of HHS and is directly responsible for the administration of the Medicare program.

22. Under Medicare, CMS makes payments retrospectively (after the services are rendered) to hospitals for inpatient services. Medicare enters into provider agreements with hospitals in order to establish the hospitals' eligibility to participate in Medicare. However, Medicare does not prospectively contract with hospitals to provide particular services for particular patients.

23. As detailed below, the Hendersonville and Skyline medical centers submitted claims both for specific services provided to individual beneficiaries and claims for general and administrative costs incurred in treating Medicare beneficiaries.

24. To assist in the administration of Medicare Part A, CMS contracts with "fiscal intermediaries." 42 U.S.C. §1395h. Fiscal intermediaries, typically insurance companies, are responsible for processing and paying claims and auditing cost reports.

25. Upon discharge of Medicare beneficiaries from a hospital, the hospital submits claims for interim reimbursement for items and services delivered to those beneficiaries during their hospital stays. 42 C.F.R. §§413.1, 413.60, 413.64. Hospitals submit patient-specific claims for interim payments on a CMS Form 1450 (UB-04).

26. As a prerequisite to payment by Medicare, CMS requires hospitals to submit annually a CMS Form 2552, more commonly known as the Hospital Cost Report. Cost Reports are the final claim that a provider submits to the fiscal intermediary for items and services rendered to Medicare beneficiaries.

27. After the end of each hospital's fiscal year, the hospital files its Hospital Cost Report with the fiscal intermediary, stating the amount of reimbursement the provider believes it is due for the year. *See* 42 U.S.C. §13959(a); 42 C.F.R. §413.20; 42 C.F.R. §405.1801(b)(1). Hence, Medicare relies upon the Hospital Cost Report to determine whether the provider is entitled to more reimbursement than already received through interim payments, or whether the provider has been overpaid and must reimburse Medicare. 42 C.F.R. §§405.1803, 413.60 and 413.64(f)(1).

28. HCA hospitals, and in particular the Skyline and Hendersonville medical centers, were, at all times relevant to this Complaint, required to submit Hospital Cost Reports to their fiscal intermediaries.

29. Medicare payments for inpatient hospital services are determined by the claims submitted by the provider for particular patient discharges – specifically listed on CMS Form 1450s (UB-04s) – during the course of the fiscal year. On the Hospital Cost Report, this Medicare liability for inpatient services is then totaled with any other Medicare liabilities to the provider. This total determines Medicare's true liability for services rendered to Medicare beneficiaries during the course of a fiscal year. From this sum, the payments made to the provider during the year are subtracted to determine the amount due the Medicare program or the amount due the provider.

30. Under the rules applicable at all times relevant to this Complaint, Medicare,

through its fiscal intermediaries, had the right to audit the Hospital Cost Reports and financial representations made by all HCA hospitals to ensure their accuracy and preserve the integrity of the Medicare Trust Funds. This right includes the right to make retroactive adjustments to Hospital Cost Reports previously submitted by a provider if any overpayments have been made. 42 C.F.R. §413.64(1).

31. Every Hospital Cost Report contains a Certification that must be signed by the chief administrator of the provider or a responsible designee of the administrator. The form thus required every provider to certify that the filed Hospital Cost Report is (1) truthful, *i.e.*, that the cost information contained in the report is true and accurate. (2) correct, *i.e.*, that the provider is entitled to reimbursement for the reported costs in accordance with applicable instructions, and (3) complete, *i.e.*, that the Hospital Cost Report is based upon all information known to the provider.

32. Specifically, at all times relevant to this Complaint, that certification included the following notice:

> MISREPRESENTATION OR FALSIFICATION OF ANY INFORMATION CONTAINED IN THIS COST REPORT MAY BE PUNISHABLE BY CRIMINAL, CIVIL AND ADMINISTRATIVE ACTION, FINE AND/OR IMPRISONMENT UNDER FEDERAL LAW. FURTHERMORE, IF SERVICES IDENTIFIED IN THIS REPORT WERE PROVIDED OR PROCURED THROUGH THE PAYMENT DIRECTLY OR INDIRECTLY OF A KICKBACK OR WERE OTHERWISE ILLEGAL, CRIMINAL, CIVIL AND ADMINISTRATIVE ACTION, FINES AND/OR IMPRISONMENT MAY RESULT.

33. Under all versions of the CMS Form 2552 certification, the provider certified that the services provided in the cost report were not infected by a kickback.

34. HCA generally and the Hendersonville and Skyline medical centers particularly

are familiar with the laws and regulations governing Medicare, including requirements relating to the completion of cost reports.

35. A hospital is required to disclose all known errors and omissions in its claims for Medicare reimbursement (including its cost reports) to its fiscal intermediary.

36. 42 U.S.C. §1320a-7b(a)(3) specifically creates a duty to disclose known errors in cost reports:

> Whoever . . . having knowledge of the occurrence of any event affecting (A) his initial or continued right to any such benefit or payment . . . conceals or fails to disclose such event with an intent fraudulently to secure such benefit or payment either in a greater amount or quantity than is due or when no such benefit or payment is authorized ... shall in the case of such a ... concealment or failure ... be guilty of a felony.

37. In addition to the hospital fees billed by hospitals, physicians and physician groups also bill for their services provided to Medicare patients. Physicians and physician groups submit form CMS-1500 for this purpose.

38. The CMS-1500 claim form requires the physician to certify that the physician "understand(s) that payment and satisfaction of this claim will be from Federal and State funds, and that any false claims, statements, or documents, or concealment of a material fact, may be prosecuted under applicable Federal or State laws."

39. By submitting CMS-1500 forms, physicians and physician groups certify that they are eligible for participation in Medicare, and that they have complied with all applicable regulations and laws governing the program, including the Anti-Kickback Statute.

40. As amended from time to time, the HHS Secretary has delegated enforcement and rulemaking authority to the HHS Office of Inspector General ("OIG") with respect to Medicare, Medicaid, and other federal health care programs under the False Claims Act, the Stark Law, and

the Anti-Kickback Statute. *See*, *e.g.*, 81 Fed. Reg. 13,807 (2016); 70 Fed. Reg. 20,147 (2005).

**The Stark Law**

41. Under 42 U.S.C. §1395nn and the Implementing regulations, 42 C.F.R. §§411.350-.389, (the "Stark Law" or "Physician Self-Referral Law"), physicians or entities providing health care items or services cannot submit claims for payment to Medicare or Medicaid based on patient referrals from physicians having a "financial relationship" – as defined in the statute and implementing regulations – with the referring physician or entity.

42. The regulations implementing Stark expressly make it illegal for anyone to receive federal payment for a health care service that was performed "pursuant to a prohibited referral" and requires such person to "refund all collected amounts on a timely basis." 42 C.F.R. §411.353(c)-(d).

43. The Stark Law defines a "referral" as "the request or establishment of a plan of care by a physician which includes the provision of the designated health service." 42 U.S.C. §1395nn(h)(5)(B). Under the implementing regulations, a "referral" includes "a request by a physician that includes the provision of any designated health service for which payment may be made under Medicare [.]" 42 C.F.R §411.351. A referring physician is defined as "a physician who makes a referral as defined in this section or who directs another person or entity to make a referral or who controls referrals made to another person or entity." *Id.*

44. The Stark Law expressly prohibits any entity from presenting or causing the presenting of any claim resulting from a referral from a physician who has a financial relationship with the entity, unless that relationship fits into one of the specific exceptions in the statute at 42 U.S.C. §1395nn(c)-(e).

45. The only Stark Law exception relevant here is the exception for "physician

recruitment," under which a hospital may provide remuneration to a physician to induce the physician to relocate to the hospital's geographic service area by serving as a member of the hospital's medical staff. *Id.* §1395nn(e)(5), provided that a physician recruiting agreement ("PRA") does not require the physician to refer patients to the hospital, does not – directly or indirectly – determine the amount of remuneration based on the value or volume of referrals, and meets any other requirements in HHS regulations designed to protect against program or patient abuse. *Id.*§1395nn(e)(5)(A)-(C).

46. HHS has issued implementing regulations at 42 C.F.R. §411.357(e), which – in addition to the statutory criteria – require that PRAs be in writing and signed by the parties, *id.* §411.357(e)(1)(i), including any existing medical practice into which a physician is recruited, *id.* §411.357(e)(4)(i), and impose other relevant criteria on a recruiting hospital's geographic service area and – for physicians recruited into an existing practice – the terms of such recruitments.

47. The HHS implementing regulations define and delimit the "geographic area served by the hospital " as "the area composed of the lowest number of contiguous zip codes from which the hospital draws at least 75 percent of its inpatients." *Id.* §411.357(e)(2)(i).

48. For physicians recruited into an existing practice, the costs – if any – included in a PRA must be limited to "the actual additional incremental costs attributable to the recruited physician," *id.* §411.357(e)(4)(ii), and all "remuneration is passed directly through to or remains with the recruited physician" except for those actual incremental costs borne by the practice. *Id.* §411.357(e)(4)(iii).

49. The implementing regulations provide a process through which an entity may request an advisory opinion on the lawfulness of a proposed arrangement. *Id.* §411.370.

**The Medicare and Medicaid Patient Protection Act or "Anti-Kickback Statute"**

50. Under the Medicare and Medicaid Patient Protection Act, 42 U.S.C. §1320a-7b(b) (hereinafter, the "Anti-Kickback Statute" or "AKS"), it is unlawful to knowingly offer or pay any remuneration in cash or in kind in exchange for the referral of any product for which payment is sought from any federally-funded health care program, including without limitation the Medicare, Medicaid, and TRICARE programs. AKS violation can subject perpetrators to both criminal and civil penalties, as well as exclusion from participation in federally-funded health care programs.

51. The AKS also provides that claims arising out of violations of its provisions are false claims because a claim "that includes items or services resulting from a violation of [the AKS] constitutes a false or fraudulent claim" for purposes of the False Claims Act. 42 U.S.C §1320a-7b(g).

52. The AKS is designed to ensure that patient care will not be improperly influenced and corrupted by compensation arrangements which are not directly related to the care of patients or which influence patient care decisions.

53. Unless an exemption applies, payment of remuneration of any kind violates the statute if one of the purposes of the payment is to induce referrals, and remuneration offered or paid in return for the promise to send patients to a particular provider or facility qualifies as a kickback.

54. The HHS OIG has issued implementing regulations for the AKS, 42 C.F.R. pt. 1001, including safe-harbor exceptions for physician recruiting agreements, 42 C.F.R. §1001.952(n), which identify circumstances in which individuals or entities may be excluded from participation in federal health care programs for violations of the terms of those programs

and of other federal law. 42 C.F.R. §1001.1(a).

55. The OIG regulations provide a safe harbor from the AKS for remuneration (*i.e.*, payment or the exchange of anything of value) by an entity to induce certain practitioners to locate their primary place of practice into a Health Professional Shortage Area ("HPSA") for their specialty area. 42 C.F.R. §1001.952(n).

56. To qualify for the safe-harbor exception from AKS liability, physician recruitment arrangements must be set forth in a written agreement signed by the parties that specifies the benefits provided by the entity, the terms under which the benefits are to be provided, and the obligations of each party, *id.* §1001.952(n)(1), with the benefits provided for a period not in excess of three years, during which time the agreement must not be renegotiated in any substantial aspect, *id.* §1001.952(n)(3), and the payment or exchange of anything of value may not directly or indirectly benefit any person – other than the recruited practitioner – or entity in a position to make or influence referrals under a federal health care program to the entity providing the recruitment payments or benefits, *id.* §1001.952(n)(9).

57. With respect to the HSPA aspects of physician recruitment, to qualify for the safe-harbor exception from AKS liability, physician recruitment arrangements also must result in at least 75 percent of the revenues of the new practice being generated from patients residing in a HPSA or a Medically Underserved Area ("MUA") or who are part of a Medically Underserved Population ("MUP") as defined in HHS regulations. *Id.* §§1001.952(n)(8), 1001.952(a)(4).

58. To qualify for the safe-harbor exception from AKS liability, physician recruitment arrangements also must not require referrals to the sponsoring entity, *id.* §1001.952(n)(4), and the benefits must not vary in any way based on the value or volume of any referrals (or business otherwise generated) that is paid in whole or in part by a federal health care program, *id.*

§1001.952(n)(6).

## FACTUAL BACKGROUND

**The Nashville Medical Market**

59. The Hendersonville and Skyline medical centers are all within the Nashville metropolitan area, but they serve distinct groups of patients.

60. For 2011 to present, there was no overlap in the contiguous ZIP codes comprising 75% for the Hendersonville and Skyline medical centers. From 2011 to present, the contiguous ZIP codes comprising 75% of the patient base for Skyline Medical Center were two or three of the following three ZIP codes: 37207, 37115, and 37072. From 2011 to present, the contiguous ZIP codes comprising 75% of the patient base for Hendersonville Medical Center were two or three of the following three ZIP codes: 37075, 37066, and 37148.

**Defendants' Recruitment Program**

61. To ensure that HCA hospitals can generate revenue by providing medical services, HCA's business model is to recruit physicians – primarily into existing practices – rather than hiring and supporting physicians as employees.

62. In 2010, to fill a community need in gastroenterology in the Hendersonville Medical Center's geographic service area, HCA, HCA Physician Services, GHA, and Hendersonville Medical Center actively recruited Maj. William E. Norris, M.D., while he served as Director of Endoscopy at Walter Reed Army Medical Center in Washington, D.C. through telephone calls, facsimiles, emails, and courier packages sent to him at his office.

63. Between October 14, 2010, and November 8, 2010, HCA, HCA Physician Services, GHA, and Hendersonville Medical Center offered to and finalized with Dr. Norris a PRA to join GHA's existing practice and acquire privileges at Hendersonville Medical Center

(the "Norris PRA"). An addendum to the PRA between Dr. Norris, GHA, and Hendersonville Medical Center defined the PRA's obligations with respect to GHA (the "Norris PRA Addendum").

64. Prior to Dr. Norris's arrival in the Nashville area in the summer of 2011, several Skyline-based gastroenterologists – including the Nashville Gastrointestinal Specialists practice, as well as Dr. Charles Winter and Dr. Men Zua – were attempting to negotiate emergency room ("ER") call pay with Skyline Medical Center. Once Dr. Norris signed at GHA and was made available for ER call at Skyline Medical Center, the Skyline administration essentially aborted negotiations by offering a below-fair-market contract for ER call pay to the gastroenterologists already available in Skyline Medical Center's geographic service area.

65. In July 2011, approximately a month before Dr. Norris began work at GHA, GHA presented Dr. Norris with an employment agreement – between Dr. Norris and GHA, but not Hendersonville Medical Center (the "Norris Employment Agreement") – that purported to alter the terms of the Norris PRA Addendum in material respects discussed below.

66. In 2014, to fill a community need in gastroenterology in the Hendersonville Medical Center's geographic service area, HCA, HCA Physician Services, GHA, and Hendersonville Medical Center actively recruited Dr. Kristin A. Gaffney while she served as Gastroenterology/Hepatology Fellow at Baylor University Medical Center.

67. As with Dr. Norris, HCA, HCA Physician Services, GHA, and Hendersonville Medical Center offered to and finalized with Dr. Gaffney a PRA to join GHA's existing practice and acquire privileges at Hendersonville Medical Center (the "Gaffney PRA"). An addendum to the PRA between Dr. Gaffney, GHA, and Hendersonville Medical Center defined the PRA's obligations with respect to GHA (the "Gaffney PRA Addendum").

68. As with Dr. Norris, in the summer of 2015, approximately a month before Dr. Gaffney began work at GHA, GHA presented Dr. Gaffney with an employment agreement – between Dr. Gaffney and GHA, but not Hendersonville Medical Center (the "Gaffney Employment Agreement") – that purported to alter the terms of the Gaffney PRA Addendum in material respects discussed below.

**Implementing the PRAs outside the Stark and AKS Safe Harbors**

69. Because the Stark and AKS exceptions for PRAs (like other exceptions) are safe harbors, physicians and entities who seek to rely on the safe harbor bear the burden of proving their full compliance with the safe harbor's terms and, failing to make that showing, fall outside the safe harbor and, thus, in violation of the Stark Law or AKS.

70. Further, although the Stark Law's safe harbor requires recruited physicians to serve at least 75% of their time in the recruiting hospital's geographic service area, GHA required Dr. Norris and Dr. Gaffney to spend well in excess 25% of their time at Skyline Medical Center, outside the geographic service area for Hendersonville Medical Center. For example, GHA directed Dr. Norris to spend over 50% of his ER call and over 30% of his office time at Skyline Medical Center, with the result that Dr. Norris spent over 40% of his time outside the Hendersonville Medical Center's geographic service area. Dr. Gaffney divided her time in a similar manner, with over 30% of her time spent at Skyline Medical Center, outside the Hendersonville Medical Center's geographic service area.

71. By supplanting the local gastroenterologists negotiating ER gastroenterology call coverage at Skyline Medical Center, *see* Paragraph 64, *supra*, with Dr. Norris and then Dr. Gaffney, Defendants were able to – and intended to – increase their referrals, procedures, and revenues at Skyline Medical Center, while essentially paying Dr. Norris and then Dr. Gaffney no

additional income for the excessive additional hours because the Norris and Gaffney PRAs capped the recruited physicians' salaries at the PRAs' salary guarantee, with any additional income rebated back to the recruiting hospital.

72. Although Henderson Medical Center, GHA, and the recruited physicians agreed in the Norris and Gaffney PRA Addenda that the recruited physicians may not enter non-compete or similar practice restrictions – except conditions related solely to quality of care or as referenced in 72 Fed. Reg. 51,012, 51,053 (Sept. 5, 2007) – GHA included a non-compete clause in the Norris and Gaffney Employment Agreements, conflicting not only with the Stark and AKS safe harbors that require that all parties sign any agreement – Hendersonville Medical Center did not sign this purported amendment – but also with the AKS safe harbor precluding the renegotiation of any substantial aspect of a PRA.

73. Although the AKS safe harbor is limited to PRAs no longer than three years, the Norris and Gaffney PRAs were for four-year periods.

74. Under the Norris and Gaffney PRAs, the HCA defendants automatically transferred not only the physician's salary guarantee but also in excess of $10,000 per month in incremental practice overhead expenses to GHA, and GHA reported monthly incremental overhead to support the recruited physicians on the HCA defendants' Form IGAP-003. Although the Norris and Gaffney PRAs required GHA to refund any excess payments, GHA retained the excesses after reporting the actual expenditures back to the HCA entities. For example, in the first year of the Norris PRA, HCA automatically paid GHA $13,500 per month (*i.e.*, $160,200 in total), and GHA reported monthly incremental overhead ranging from under $1,800 to under $8,800 per month for an annual total of less than $60,000 in actual expenditures in incremental overhead to support Dr. Norris. In violation of the Stark and AKS safe harbors that all funds pass

through to the recruited physician, GHA thus retained over $100,000 in HCA remuneration intended to support Dr. Norris, with the HCA defendants' knowledge, not only through the monthly Form IGAP-003 that GHA submitted but also as described in Paragraphs 75-81, *infra*.

75. In June of 2012, Dr. Norris had conversations with Hendersonville Medical Center's Chief Operating Officer, Michael Morrison, initially regarding Dr. Norris's need to repay that hospital collections in excess of Dr. Norris's income guarantee in the Norris PRA. During these conversations, Dr. Norris that the excess collections resulted from his taking ER call coverage on average eight (8) days/nights a month call on average fifteen (15) days a month at Skyline Medical Center, which was not included in the Norris PRA.

76. On or about October 1, 2012, GHA provided Dr. Norris with a partnership offer, which Dr. Norris declined to sign until after he could review the medical practice books as well as a third-party medical practice audit., which ultimately was conducted by the Henderson Financial Group but not shown to Dr. Norris, even though he paid one third of the audit's cost.

77. In April 2013, Dr. Norris and HCA Physician Recruiting had a discussion about Dr. Norris's professional plans, in which they discussed how the Norris PRA earmarked $60,000 for incremental overhead in the form of medical staff support and benefits during the Norris PRA's first year (September 2011-August 2012), and Dr. Norris indicated that he did not receive any staff support until March 2013, when he took the initiative to hire staff.

78. On or about May 17, 2013, and effective on or about May 24, 2013, GHA terminated Dr. Norris, but Defendants did not release him from obligations to the HCA entities under the terms of the Norris PRA. Consequently, although Dr. Norris would have preferred to leave the Nashville area, he had to remain and open his own practice to support the HCA entities.

79. GHA and Dr. Norris are engaged in state-law litigation over whether GHA's

termination of Dr. Norris was pretextual, among other state-law claims, in *Norris v. Gastroenterology and Hepatology Associates, PLLC*, No. 83CC1-2014-CV541 (Sumner Cty. Tenn.).

80. On May 19, 2014, Dr. Norris wrote Hendersonville Medical Center's Chief Executive Officer ("CEO") – who had signed the Norris PRA for the medical center – to void the PRA for various reasons, including (a) GHA's retaining the $60,000 that the PRA allocated to incremental medical staff support for Dr. Norris, and (b) the excessive time at Skyline Medical Center outside Hendersonville Medical Center's geographic service area under the Stark Law regulations.

81. On June 5, 2014, an outside counsel for HCA and Henderson Medical Center responded to Dr. Norris by indicating that there was no basis for rescinding the PRA and forwarding a purported assignment agreement dated June 5, 2013, by the Skyline Medical Center CEO and July 31, 2013, by the Henderson Medical Center CEO, with the following explanation:

> Hendersonville assigned the recruitment agreement to Skyline. A copy of the assignment is attached. Although the attached copy does not bear your signature, your prior counsel, Mr. Kinslow, approved the assignment and Hendersonville and Skyline signed it based on such approval. It is clear that the assignment was done with your consent and at your request and that you agreed to practice (and did practice) in Skyline's area. You may sign the document to memorialize your consent. Moreover, please note that Paragraph 17 of the recruitment agreement allowed Hendersonville to assign the contract even without your consent.

Mr. Kinslow never disclosed the purported assignment to Dr. Norris, and Dr. Norris subsequently discharged him for failing to disclose the ethical conflict or apparent ethical conflict that he also worked with HCA. Assuming *arguendo* that the HCA entities indeed created and signed the assignment circa the summer of 2013 as they claim – as opposed to creating it and backdating in

the summer of 2014 – the HCA entities did not provide a copy to Dr. Norris until June 5, 2014. In any event, the purported assignment is ineffective for several reasons: (a) it was not signed by Dr. Norris, in violation of the Stark and AKS safe harbors that all parties sign a PRA, assuming that PRAs indeed can be amended; (b) the assignment purports to renegotiate a substantial aspect of the PRA, in violation of the AKS safe harbor; (c) as amended by the purported assignment, the PRA would remain absolutely the same in all material aspects (*i.e.*, whether the PRA is assigned to a hospital in Nashville or Alaska, Dr. Norris's obligation under the PRA would remain his original duties to the Henderson Medical Center); and (d) assuming *arguendo* that one hospital could assign a recruited physician to another hospital, the 60%-40% split in Dr. Norris's time with the Hendersonville and Skyline medical centers would remain in noncompliance with the Stark safe harbor's requirement to work 75% of his time in the assignor, even if the assignment could cure the Stark Law non-compliance vis-à-vis the assignee.

82. As described in Paragraphs 75-81, *supra*, Defendants were on notice from their interactions with Dr. Norris that Skyline Medical Center was outside of Hendersonville Medical Center's geographic service area for purposes of the Stark Law's PRA safe harbor, but recruited Dr. Gaffney for Hendersonville Medical Center into the existing GHA practice, and repeated the same Stark Law violation with Dr. Gaffney.

**False Claims and Kickbacks**

83. The primary reason that Defendants violated the False Claims Act is that the PRAs did not meet the Stark and AKS safe harbors for PRAs, thus rendering all transactions for the affected physicians, practice, and hospitals – namely, all consults, procedures, referrals, lab work, and any ancillary services – tainted by impermissible self-referrals and kickbacks.

84. Each year since 2011 and continuing through the filing of the original Complaint,

the Hendersonville and Skyline medical centers submitted Hospital Cost Reports that represented compliance with Medicare regulations and laws, including the Stark Law and AKS.

85. Based on the facts alleged herein, the Hendersonville and Skyline medical centers appear to have been aware since 2011, but in any event became aware in 2013-14 of the improper PRA arrangements here, and continued to retain the claims originally made to Medicare. Either because the Hendersonville and Skyline medical centers were aware of their false claims when originally made or because the Hendersonville and Skyline medical centers became aware of the falsity of those claims and failed to correct those claims, the Hendersonville and Skyline medical centers submitted Hospital Cost Reports that *falsely* represented compliance with Medicare regulations and laws, including the Stark Law and AKS. In light of the foregoing, each CMS Form 1450 (UB-04) and CMS Form 2552 submitted by the Hendersonville and Skyline medical centers was a false claim.

86. Similarly, the CMS Form 1500s submitted by Defendants during the period from September 1, 2011 to July 31, 2015, for Dr. Norris, and from September 1, 2015 to present for Dr. Gaffney also falsely certified compliance with federal health care programs, including the Stark Law and AKS.

87. Although Defendants submitted hundreds of false claims for specific consults, procedures, referrals, lab work, and ancillary services to be determined through discovery, see Paragraph 100, infra, the false claims include without limitation patient care on May 18, 2013, at Skyline Medical Center for medical record numbers 215150, 833241, and 623473, and on January 3, 2012, at Henderson Medical Center for Medicare number 309461607A.

**Harms to the United States from the Defendants' Illegal Conduct**

88. Congress legislated against self-referral and kickbacks in federal health care

programs both to control costs – vis-à-vis fraud – and to preserve the patient-physician relationship, which can be eroded by financially self-interested transactions (*e.g.*, unnecessary tests, less-than-qualified referrals). Preserving the economic independence and patient-centered focus of the ideal physician-patient relationship furthers these important federal goals. Conversely, violations of the Stark and AKS safe harbors – and thus the Stark Law and AKS – implicate these important federal interests and warrant this Court's intervention.

89. HHS's OIG has warned "improper recruitment arrangements" pose a "significant risk of fraud and abuse," which "hospitals should scrutinize … with care," and that "hospitals should be aware that the practitioner recruitment safe harbor excludes any arrangement that directly or indirectly benefits any existing or potential referral source other than the recruited physician" that "the safe harbor does not protect 'joint recruitment' arrangements between hospitals and other entities or individuals, such as … group practices …, pursuant to which the hospital makes payments directly or indirectly to the other entity or individual" because "[t]hese joint recruitment arrangements present a high risk of fraud and abuse." 70 Fed. Reg. 4858, 4868 (2005). Accordingly, "Hospitals should review all 'joint recruiting' arrangements to ensure that remuneration does not inure in whole or in part to the benefit of any party other than the recruited physician." *Id.*

90. More specifically, allowing recruited physicians to work outside the medical need that warranted their federally subsidized relocation via the Stark and AKS exceptions harms the patients in the geographic area to which the physician was recruited.

91. Further, misaligning physicians for economic self-interest as opposed to patient care diverts scarce physicians from where they are needed, which is especially true in the field of gastroenterology due to a looming physician shortage from an aging population.

92. For all of these reasons, false certifications of compliance with federal health care programs that seek to hide Stark and AKS violations are especially serious to the United States and universally warrant strict enforcement because of the materiality of the certification (and Stark and AKS compliance) to the financial and ethical viability of these federal programs.

**Factors that Exacerbate the Defendants' Culpability**

93. HCA is a repeat (and serious) violator of False Claims Act, with penalties of $731 million in 2000, $631 million in 2003, and at least four settlements announced between 2012 and 2015 on the Department of Justice's website.

94. HCA's 10(k) annual report filed with the Security & Exchange Commission ("SEC") cavalierly suggests that compliance is difficult: "it is unclear how the government will interpret many of these exceptions for enforcement purposes" and "we do not always have the benefit of significant regulatory or judicial interpretation of the Stark Law and its implementing regulations;" thus while "[HCA entities] attempt to structure our relationships to meet an exception to the Stark Law, … the regulations implementing the exceptions are detailed and complex, and we cannot assure that every relationship complies fully with the Stark Law." HCA Holdings, Inc., Form 10-K, at 20-21 (Feb. 26, 2016). Neither HCA nor its constituent entities nor GHA sought an advisory opinion in connection with the PRAs at issue here.

95. Although the HCA defendants were generally on notice of the need to scrutinize joint recruiting arrangements through practice groups like GHA because of the high risk of fraud through payments' inuring to the practice group, 70 Fed. Reg. at 4868, and specifically on notice that GHA had indeed retained significant portions of the incremental overhead allocated to help recruited physicians set up their practice at Hendersonville Medical Center, the HCA defendants elected both (a) to engineer a synthetic transfer from Hendersonville Medical Center to Skyline

Medical Center, *see* Paragraph 81, *supra*, rather than self-report the Stark and AKS violations, and (b) to continue to certify continuing compliance on their Hospital Cost Reports (CMS-2552).

96. Engaging in deceit and covering up past violations evidences intent with respect not only to the cover up itself but also to the original violation.

97. In addition to the various missed opportunities that Defendants had to correct their False Claims Act violation with respect to the Norris PRA, the Defendants "doubled down" by replicating the same violations with respect to the Gaffney PRA.

## ALLEGATIONS REGARDING SPECIFIC FALSE CLAIMS

98. Defendants' fraudulently claiming and keeping money has two components under the False Claims Act, Stark Law, and AKS: (1) the improperly executed PRAs outside the Stark Law and AKS safe harbors for PRAs, and (2) the specific amounts claimed from the federal government while in violation of the Stark Law and AKS. The improper PRAs in the first component make each claim submitted in the second component unlawful, even if the claims would otherwise have been lawful, in the absence of the improper PRAs.

99. Consistent with FED. R. CIV. P. 9(b), Relator pleads Defendants' fraud respecting the improper PRAs with particularity, *see* Paragraphs 69-82, *supra*, but Relator cannot fully plead the specifics of the individual claims that Defendants unlawfully submitted to the United States and unlawfully retained because the particular procedures, invoices, and other information needed to plead each false claim with particularity are private patient records exclusively in the possession of Defendants and the United States, as well as the individual patients.

100. From Relator's own knowledge, Defendants submitted – and then subsequently retained the funds for – hundreds of claims to Medicare for payment in amounts ranging from below a hundred dollars to over ten thousand dollars each, over the periods covered by the

improper PRAs. Pursuant to FED. R. CIV. P. 11(b)(3), Relator states on information and belief, formed after reasonable inquiry, which certainly could be confirmed with the opportunity for discovery of Defendants' billing database or the United States' claims database, that a definite claim could be stated with particularity as to the number of false claims, their dates, and their amounts. In addition to that claim on information and belief, Relator also identifies several specific false claims in Paragraph 87, *supra*.

101. The full universe of false claims would be all of the Medicare claims submitted by Defendants during the periods covered by the improper PRAs (namely, September 1, 2011, to the present).

**COUNT I**
**FALSE CLAIMS ACT: PRESENTATION OF FALSE CLAIMS**

102. Relator incorporates Paragraphs 1-101 and 105-118 as if fully set forth herein.

103. In violation of 31 U.S.C. §3729(a)(1)(A), Defendants knowingly presented or caused to be presented false or fraudulent claims for payment or approval to the United States, including claims for reimbursement for services rendered to patients unlawfully referred to HCA and GHA facilities by physicians to whom Defendants provided kickbacks and/or illegal remuneration in violation of the Stark Law and Anti-Kickback Statute.

104. By virtue of the false or fraudulent claims made by the Defendants, the United States suffered damages and therefore is entitled to multiple damages under the False Claims Act, to be determined at trial, plus a civil penalty of $5,500 to $11,000 for each violation, as adjusted by FCPIA.

**COUNT II**
**FALSE CLAIMS ACT: MAKING OR USING FALSE RECORD OR STATEMENT TO CAUSE CLAIM TO BE PAID**

105. Relator incorporates Paragraphs 1-104 and 108-118 as if fully set forth herein.

106. In violation of 31 U.S.C. §3729(a)(1)(B), Defendants knowingly made, used, or caused to be made or used, false records or statements – *i.e.*, the false certifications and representations made or caused to be made by Defendants when initially submitting the false claims for interim payments and the false certifications made or caused to be made by Defendants in submitting the cost reports – to get false or fraudulent claims paid or approved by the United States.

107. By virtue of the false records or false statements made by the Defendants, the United States suffered damages and therefore is entitled to treble damages under the False Claims Act, to be determined at trial, plus a civil penalty of $5,500 to $11,000 for each violation, as adjusted by FCPIA.

**COUNT III**
**FALSE CLAIMS ACT: MAKING OR USING FALSE RECORD OR STATEMENT TO AVOID AN OBLIGATION TO REFUND**

108. Relator incorporates Paragraphs 1-107 and 111-118 as if fully set forth herein.

109. In violation of 31 U.S.C. §3729(a)(1)(G), Defendants knowingly made, used or caused to be made or used false records or false statements – *i.e.*, the false certifications made or caused to be made by Defendants in submitting the cost reports – to conceal, avoid or decrease an obligation to payor transmit money or property to the United States.

110. By virtue of the false records or false statements made by the Defendants, the United States suffered damages and therefore is entitled to treble damages under the False

Claims Act, to be determined at trial, plus a civil penalty of $5,500 to $11,000 for each violation, as adjusted by FCPIA.

**COUNT IV**
**FALSE CLAIMS ACT: CONSPIRING TO SUBMIT FALSE CLAIMS**

111. Relator incorporates Paragraphs 1-110 and 115-118 as if fully set forth herein.

112. In violation of 31 U.S.C. §3729(a)(1)(C), Defendants entered into agreements with certain physicians and each other and conspired to defraud the United States by submitting false or fraudulent claims for reimbursement from the United States for monies to which they were not entitled.

113. As part of schemes and agreements to obtain reimbursement from the United States in violation of federal laws, Defendants conspired to provide kickbacks and illegal compensation to physicians in violation of the Anti-Kickback Statute and Stark Law, and to cause the United States to pay claims for health care services based on false claims and false statements that the services were provided in compliance with all laws regarding the provision of health care services when they were not so provided.

114. By virtue of Defendants' conspiracy to defraud the United States, the United States suffered damages and therefore is entitled to treble damages under the False Claims Act, to be determined at trial, plus a civil penalty of $5,500 to $11,000 for each violation, as adjusted by FCPIA.

**COUNT V**
**STARK LAW: ENTERING IMPROPER ARRANGEMENTS**

115. Relator incorporates Paragraphs 1-114 and 118 as if fully set forth herein.

116. In violation of 42 U.S.C. §1395nn(g)(4), Defendants knowingly entered into

improper PRAs and other arrangements with certain physicians and each other with a principal purpose of assuring referrals to the Defendants in violation of 42 U.S.C. §1395nn.

117. By virtue of Defendants' unlawful arrangements, the United States suffered damages and therefore is entitled to treble damages under the False Claims Act, to be determined at trial, plus a civil penalty of $100,000 for each violation, as adjusted by FCPIA.

## PRAYER FOR RELIEF

118. WHEREFORE, Relator, on behalf of the United States Government, prays for the following relief:

A. That this Court enter judgment against Defendants in an amount equal to three times the amount of actual damages the United States Government has sustained because of Defendants' actions, plus a civil penalty of $5,500 to $11,000 – as adjusted by FCPIA – for each action in violation of 31 U.S.C. §3729, and the costs of this action, with interest, including the costs of the United States for its expenses related to this action;

B. That the Relator be awarded all costs incurred, including reasonable attorneys' fees;

C. That, in the event that the United States Government takes over this action, the Relator be awarded an amount for bringing this action of at least 15% but not more than 25% of the proceeds of the action or settlement of the claim;

D. That, in the event the United States does not proceed with this action, the Relator be awarded an amount that the Court decides is reasonable for collecting the civil penalty and damages, which shall not be less than 25% nor more than 30% of the proceeds of the action or the settlement;

E. That the Relator be awarded prejudgment interest;

F. That a trial by jury be held on all issues; and

G. That the United States Government and Relator be awarded such other relief, both in law and in equity, to which they may reasonably appear entitled.

Dated: October 26, 2016

Respectfully submitted,

Lawrence J. Joseph, D.C. Bar No. 464777

1250 Connecticut Ave. NW, Suite 200
Washington, DC 20036
Tel: 202-355-9452
Fax: 202-318-2254
Email: ljoseph@larryjoseph.com

*Counsel for Relator Jan Doe*