**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

UNITED STATES OF AMERICA *ex rel.* )
ESTATE OF WILLIAM E. NORRIS, M.D., )
 127 ½ E. Solomon Street )
 Griffin, GA 30224-2271, )
 )
   Plaintiff and Relator, )
 )
    v. )
 )
HCA HOLDINGS, INC., *d.b.a.* HCA – )
HOSPITAL CORPORATION OF AMERICA and )
HOSPITAL CORPORATION OF AMERICA, )
*a.k.a.* HCA HEALTHCARE, INC., )   No. 1:16-cv-02155-APM
 1 Park Plaza )
 Nashville, TN 37203, )
 )
HCA PHYSICIAN SERVICES, INC., )
 1 Park Plaza )
 Nashville, TN 37203, )
 )
HENDERSONVILLE HOSPITAL )
CORPORATION *d.b.a.* HENDERSONVILLE )
MEDICAL CENTER, )
 1 Park Plaza )
 Nashville, TN 37203, )
 )
HTI MEMORIAL HOSPITAL CORPORATION )
*d.b.a.* SKYLINE MEDICAL CENTER, )
 1 Park Plaza )
 Nashville, TN 37203, )
 )
   and )
 )
GASTROENTEROLOGY & HEPATOLOGY )
ASSOCIATES, PLLC, )
 107 Glen Oak Boulevard, Suite 202 )
 Hendersonville, TN 37075, )
 )
   Defendants. )

**FIRST AMENDED COMPLAINT FOR VIOLATIONS OF FEDERAL**
**FALSE CLAIMS ACT AND RELATED STATE-LAW CLAIMS**

  On behalf of itself and the United States, the bankruptcy estate of relator William E.

Norris, M.D., ("Relator") brings this action under the False Claims Act, 31 U.S.C. §§3729-3733,

against defendants HCA Healthcare, Inc. (which has changed its name from HCA Holdings, Inc. subsequent to the initial filing of this action), HCA Physician Services, Inc., Hendersonville Hospital Corp., HTI Memorial Hospital Corp., and Gastroenterology and Hepatology Associates, PLLC (collectively, hereinafter "Defendants"), both for breach of state-law obligations and for violations of the Medicare program, 42 U.S.C. §§1395-1395kkk-l, the Stark Law, 42 U.S.C. §1395nn, and the Anti-Kickback Statute, 42 U.S.C. §1320a-7b(b), based on the following allegations.

## NATURE OF THE ACTION

1.      As set forth more fully herein, Relator seeks both to recover federal funds unlawfully claimed and held by Defendants in violation of the False Claims Act and to recover under state law for breach of contract and such other relief as the Court deems proper.

2.      As required by 31 U.S.C. §3730(b)(2), relator served the United States Attorney General and the United States Attorney for the District of Columbia with copies of this complaint along with a written disclosure of material evidence related to the complaint. The disclosure statement supports the allegations herein of false claims against the United States by the defendants.

3.      As required by the False Claims Act, this complaint was filed under seal and not served on the defendants until after the Court partially unsealed the case upon the United States' declining to intervene.

## PARTIES

4.      The United States is the real party in interest to the federal claims. Through the Department of Health & Human Services ("HHS") and the Centers for Medicare and Medicaid Services ("CMS"), the United States provides health care to its citizens through the Medicare

and Medicaid programs.

5.      Defendant HCA Holdings, Inc. ("HCA") is a Delaware corporation, headquartered in Nashville, that operates for-profit health care facilities. HCA does business under the assumed names "HCA – Hospital Corporation of America" and "Hospital Corporation of America;" HCA changed its name to HCA Healthcare, Inc. after the filing of the initial complaint. HCA manages approximately 170 hospitals and 110 freestanding surgical centers in the United States and the United Kingdom. As explained in Paragraph 110, *infra*, HCA is a serial violator of the False Claims Act and has paid well more than a billion dollars in criminal and civil penalties for violating the False Claims Act.

6.       Defendant HCA Physician Services, Inc. is a Tennessee corporation and wholly owned subsidiary of defendant HCA. As a part of the HCA network, HCA Physician Services focuses on implementing value-added physician solutions for HCA.

7.      Defendant Hendersonville Hospital Corporation is a Tennessee corporation and a subsidiary of defendant HCA doing business under the assumed name "Hendersonville Medical Center." Hendersonville Medical Center manages a hospital located at 355 New Shackle Island Road, Hendersonville, Tennessee 37075.

8.      Defendant HTI Memorial Hospital Corporation is a Tennessee corporation and a subsidiary of defendant HCA doing business under the assumed name "Skyline Medical Center." Skyline Medical Center manages a hospital located at 3441 Dickerson Pike, Nashville, Tennessee 37207.

9.      Defendant Gastroenterology & Hepatology Associates, PLLC ("GHA") is a Tennessee professional limited liability company operating a medical practice in Hendersonville, Tennessee.

10.    The original *qui tam* relator was William E. Norris, M.D., who was replaced by the bankruptcy estate from *In re Norris*, No. 16-12454-WHD (N.D. Ga. filed Dec. 5, 2016).[1] Dr. Norris worked for defendant GHA, was recruited to the Nashville area by defendants HCA Physician Services, Hendersonville Medical Center, and GHA, and had admission privileges and practiced at defendants Hendersonville Medical Center and Skyline Medical Center. To Relator's and Dr. Norris's knowledge, the allegations herein have not been disclosed: in a federal proceeding in which the Federal Government is a party; in a Government Accountability Office, or other Federal report, hearing, audit, or investigation; or in the news media. Further, Relator is an "original source" of the allegations herein, as that term is defined in 31 U.S.C. §3730(e)(4)(B).

## JURISDICTION AND VENUE

11.    The federal claims in this action arise out of Defendants' ongoing violations of the federal Medicare, Stark, AKS, and False Claims Acts, and, therefore, raises federal questions over which this Court has jurisdiction pursuant to 28 U.S.C. §1331.

12.    The state-law claims in this action arise out of defendant GHA's violations and breaches of state-law obligations for more than two years of Dr. Norris's salary – $400,000 annually – which exceeds the jurisdictional amount in controversy under 28 U.S.C. §1332(a). Defendants all are citizens of Tennessee, and Relator and Dr. Norris are citizens of Georgia.

---

[1]    Contemporaneously with filing of the initial complaint, Dr. Norris moved the Court for leave to proceed pseudonymously as Jan Doe. Now that Relator has added Dr. Norris's state-law claims to this action, proceeding pseudonymously is unwarranted.

13.     To the extent that this Court lacked diversity jurisdiction for the state-law claims, those claims would nonetheless fall within this Court's supplemental jurisdiction pursuant to 28 U.S.C. §1367 because those claims arise out of the same case or controversy under Article III and the same contractual and employment relationships.

14.     Pursuant to 31 U.S.C. §3732(a), venue is proper in this Court because Defendants actively recruited and contracted with Dr. William E. Norris while he was stationed at Walter Reed Army Medical Center in Washington, D.C. and because the false claims prohibited by 31 U.S.C. §3729 were submitted to the federal government in Washington, D.C.

15.     An actual and justiciable controversy exists between plaintiff United States and the Defendants with respect to the federal claims and between the Relator and the Defendants with respect to the state-law claims.

## STATUTORY AND REGULATORY FRAMEWORK

16.     The following subsections identify the pertinent laws and regulations relevant to this action. Unless otherwise stated, the cited laws and regulations were in effect unchanged in any material respect for the period covered by this Complaint (namely, 2011 to the present).

**False Claims Act**

17.     The False Claims Act, 31 U.S.C. §§3729-3733 ("FCA"), prohibits the submission of false or fraudulent claims and false statements in order to obtain or keep federal money.

18.     As amended by the Fraud Enforcement and Recovery Act of 2009, the False Claims Act creates civil liability for any person who:

> (A) knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval;
>
> (B) knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim;

(C) conspires to commit a violation of subparagraph (A), (B), (D), (E), (F), or (G);

. . .

(G) knowingly makes, uses, or causes to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the Government, or knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the Government, . . .

31 U.S.C. §3729(a)(1). The terms "knowing" and "knowingly" in the statute "mean that a person, with respect to information – (i) has actual knowledge of the information; (ii) acts in deliberate ignorance of the truth or falsity of the information; *or* (iii) acts in reckless disregard of the truth or falsity of the information" and "require no proof of specific intent to defraud." 31 U.S.C. §3729(b)(1)(A)-(B) (emphasis added).

19.     The civil penalties for FCA violations are set by statute and adjusted for inflation pursuant to the Federal Civil Penalties Inflation Adjustment Act of 1990, (codified as amended at 28 U.S.C. 2461 note 2(a)), as amended by the Federal Civil Penalties Inflation Adjustment Act Improvements Act of 2015, Pub. L. No. 11-74, §701, 129 Stat. 584, 599-601 (2015) ("FCPIA"); *see also* 28 CFR §85.3(a)(9).

**Medicare**

20.     In 1965, Congress enacted Title XVIII of the Social Security Act, known as the Medicare program, to pay for the costs of certain health care services. Entitlement to Medicare is based on age, disability, or affliction with end-stage renal disease. *See* 42 U.S.C. §§426, 426a. Although the Medicare program has four parts, only Medicare Parts A and B are relevant here.

21.     Medicare Part A authorizes payment for institutional care, including hospital, skilled nursing facility and home health care. *See* 42 U.S.C. §§1395c-1395i-4. Most hospitals, including all the HCA's U.S.-based hospitals, derive a substantial portion of their revenue from

Medicare.

22.     Medicare Part B authorizes payment for, among other things, outpatient hospital services. 42 U.S.C. §§1395k(a), 1395l(t), and (as a federally subsidized, voluntary insurance program) covers a percentage of the fee schedule amount of physician and laboratory services. 42 U.S.C. §§1395k, 13951, 1395x(s).

23.     HHS is responsible for the administration and supervision of the Medicare program. CMS is an agency of HHS and is directly responsible for the administration of the Medicare program.

24.     Under Medicare, CMS makes payments retrospectively (after the services are rendered) to hospitals for inpatient services. Medicare enters into provider agreements with hospitals in order to establish the hospitals' eligibility to participate in Medicare.

25.     As detailed below, the Hendersonville and Skyline medical centers submitted claims both for specific services provided to individual beneficiaries and claims for general and administrative costs incurred in treating Medicare beneficiaries.

26.     To assist in the administration of Medicare Part A, CMS contracts with "fiscal intermediaries." 42 U.S.C. §1395h. Fiscal intermediaries, typically insurance companies, are responsible for processing and paying claims and auditing cost reports.

27.     Upon discharge of Medicare beneficiaries from a hospital, the hospital submits claims for interim reimbursement for items and services delivered to those beneficiaries during their hospital stays. 42 C.F.R. §§413.1, 413.60, 413.64. Hospitals submit patient-specific claims for interim payments on a CMS Form 1450 (UB-04).

28.     As a prerequisite to payment by Medicare, CMS requires hospitals to submit annually a CMS Form 2552, more commonly known as the Hospital Cost Report. Cost Reports

are the final claim that a provider submits to the fiscal intermediary for items and services rendered to Medicare beneficiaries.

29.     After the end of each hospital's fiscal year, the hospital files its Hospital Cost Report with the fiscal intermediary, stating the amount of reimbursement the provider believes it is due for the year. *See* 42 U.S.C. §13959(a); 42 C.F.R. §413.20; 42 C.F.R. §405.1801(b)(1). Hence, Medicare relies upon the Hospital Cost Report to determine whether the provider is entitled to more reimbursement than already received through interim payments, or whether the provider has been overpaid and must reimburse Medicare. 42 C.F.R. §§405.1803, 413.60 and 413.64(f)(1).

30.     HCA hospitals, and particularly the Skyline and Hendersonville medical centers, were, at all times relevant to this Complaint, required to submit Hospital Cost Reports to their fiscal intermediaries.

31.     Medicare payments for inpatient hospital services are determined by the claims submitted by the provider for particular patient discharges – specifically listed on CMS Form 1450s (UB-04s) – during the fiscal year. On the Hospital Cost Report, this Medicare liability for inpatient services is then totaled with any other Medicare liabilities to the provider. This total determines Medicare's true liability for services rendered to Medicare beneficiaries during a fiscal year. From this sum, the payments made to the provider during the year are subtracted to determine the amount due the Medicare program or the amount due the provider.

32.     Under the rules applicable at all times relevant to this Complaint, Medicare, through its fiscal intermediaries, had the right to audit the Hospital Cost Reports and financial representations made by all HCA hospitals to ensure their accuracy and preserve the integrity of the Medicare Trust Funds. This right includes the right to make retroactive adjustments to

Hospital Cost Reports previously submitted by a provider if any overpayments have been made. 42 C.F.R. §413.64(1).

33.     Every Hospital Cost Report contains a Certification that must be signed by the chief administrator of the provider or a responsible designee of the administrator. The form thus required every provider to certify that the filed Hospital Cost Report is (1) truthful, *i.e.*, that the cost information contained in the report is true and accurate. (2) correct, *i.e.*, that the provider is entitled to reimbursement for the reported costs in accordance with applicable instructions, and (3) complete, *i.e.*, that the Hospital Cost Report is based upon all information known to the provider.

34.     Specifically, at all times relevant to this Complaint, that certification included the following notice:

> MISREPRESENTATION OR FALSIFICATION OF ANY INFORMATION CONTAINED IN THIS COST REPORT MAY BE PUNISHABLE BY CRIMINAL, CIVIL AND ADMINISTRATIVE ACTION, FINE AND/OR IMPRISONMENT UNDER FEDERAL LAW. FURTHERMORE, IF SERVICES IDENTIFIED IN THIS REPORT WERE PROVIDED OR PROCURED THROUGH THE PAYMENT DIRECTLY OR INDIRECTLY OF A KICKBACK OR WERE OTHERWISE ILLEGAL, CRIMINAL, CIVIL AND ADMINISTRATIVE ACTION, FINES AND/OR IMPRISONMENT MAY RESULT.

35.     Under all versions of the CMS Form 2552 certification, the provider certified that the services provided in the cost report were not infected by a kickback.

36.     HCA generally and the Hendersonville and Skyline medical centers particularly are familiar with the laws and regulations governing Medicare, including requirements relating to the completion of cost reports.

37.     A hospital is required to disclose all known errors and omissions in its claims for

Medicare reimbursement (including its cost reports) to its fiscal intermediary.

38.     42 U.S.C. §1320a-7b(a)(3) specifically creates a duty to disclose known errors in cost reports:

> Whoever . . . having knowledge of the occurrence of any event affecting (A) his initial or continued right to any such benefit or payment . . . conceals or fails to disclose such event with an intent fraudulently to secure such benefit or payment either in a greater amount or quantity than is due or when no such benefit or payment is authorized ... shall in the case of such a ... concealment or failure ... be guilty of a felony.

39.     In addition to the hospital fees billed by hospitals, physicians and physician groups also bill for their services provided to Medicare patients. Physicians and physician groups submit form CMS-1500 for this purpose.

40.     The CMS-1500 claim form requires the physician to certify that the physician "understand(s) that payment and satisfaction of this claim will be from Federal and State funds, and that any false claims, statements, or documents, or concealment of a material fact, may be prosecuted under applicable Federal or State laws."

41.     By submitting CMS-1500 forms, physicians and physician groups certify that they are eligible for participation in Medicare, and that they have complied with all applicable regulations and laws governing the program, including the Anti-Kickback Statute.

42.     As amended from time to time, the HHS Secretary has delegated enforcement and rulemaking authority to the HHS Office of Inspector General ("OIG") with respect to Medicare, Medicaid, and other federal health care programs under the False Claims Act, the Stark Law, and the Anti-Kickback Statute. *See*, *e.g.*, 81 Fed. Reg. 13,807 (2016); 70 Fed. Reg. 20,147 (2005).

**The Stark Law**

43.     Under 42 U.S.C. §1395nn and the Implementing regulations, 42 C.F.R.

§§411.350-.389, (the "Stark Law" or "Physician Self-Referral Law"), physicians or entities providing health care items or services cannot submit claims for payment to Medicare or Medicaid based on patient referrals from physicians having a "financial relationship" – as defined in the statute and implementing regulations – with the referring physician or entity.

44.     The regulations implementing Stark expressly make it illegal for anyone to receive federal payment for a health care service that was performed "pursuant to a prohibited referral" and requires such person to "refund all collected amounts on a timely basis." 42 C.F.R. §411.353(c)-(d).

45.     The Stark Law defines a "referral" as "the request or establishment of a plan of care by a physician which includes the provision of the designated health service." 42 U.S.C. §1395nn(h)(5)(B). Under the implementing regulations, a "referral" includes "a request by a physician that includes the provision of any designated health service for which payment may be made under Medicare[.]" 42 C.F.R §411.351. A referring physician is defined as "a physician who makes a referral as defined in this section or who directs another person or entity to make a referral or who controls referrals made to another person or entity." *Id.*

46.     The Stark Law expressly prohibits any entity from presenting or causing the presenting of any claim resulting from a referral from a physician who has a financial relationship with the entity, unless that relationship fits into one of the specific exceptions in the statute at 42 U.S.C. §1395nn(c)-(e).

47.     The only Stark Law exception relevant here is the exception for "physician recruitment," under which a hospital may provide remuneration to a physician to induce the physician to relocate to the hospital's geographic service area by serving as a member of the hospital's medical staff. *Id.* §1395nn(e)(5), provided that a physician recruiting agreement

("PRA") does not require the physician to refer patients to the hospital, does not – directly or indirectly – determine the amount of remuneration based on the value or volume of referrals, and meets any other requirements in HHS regulations designed to protect against program or patient abuse. *Id.*§1395nn(e)(5)(A)-(C).

48.     HHS has issued implementing regulations at 42 C.F.R. §411.357(e), which – in addition to the statutory criteria – require that PRAs be in writing and signed by the parties, *id.* §411.357(e)(1)(i), including any existing medical practice into which a physician is recruited, *id.* §411.357(e)(4)(i), and impose other relevant criteria on a recruiting hospital's geographic service area and – for physicians recruited into an existing practice – the terms of such recruitments.

49.     The HHS implementing regulations define and delimit the "geographic area served by the hospital " as "the area composed of the lowest number of contiguous zip codes from which the hospital draws at least 75 percent of its inpatients." *Id.* §411.357(e)(2)(i).

50.     For physicians recruited into an existing practice, the costs – if any – included in a PRA must be limited to "the actual additional incremental costs attributable to the recruited physician," *id.* §411.357(e)(4)(ii), and all "remuneration is passed directly through to or remains with the recruited physician" except for those actual incremental costs borne by the practice. *Id.* §411.357(e)(4)(iii).

51.     The implementing regulations provide a process through which an entity may request an advisory opinion on the lawfulness of a proposed arrangement. *Id.* §411.370. According to HHS's implementing regulations, "[t]he failure of a party to seek or to receive an advisory opinion may not be introduced into evidence to prove that the party either intended or did not intend to violate the provisions of sections 1128, 1128A or 1128B of the Act." 42 C.F.R. §411.388, but federal agencies lack the constitutional and statutory authority to issue evidentiary

rules binding on courts for either the federal claims or *a fortiori* the state-law claims here under this Court's diversity or supplemental jurisdiction.

**The Medicare and Medicaid Patient Protection Act or "Anti-Kickback Statute"**

52.     Under the Medicare and Medicaid Patient Protection Act, 42 U.S.C. §1320a-7b(b) (hereinafter, the "Anti-Kickback Statute" or "AKS"), it is unlawful to knowingly offer or pay any remuneration in cash or in kind in exchange for the referral of any product for which payment is sought from any federally-funded health care program, including without limitation the Medicare, Medicaid, and TRICARE programs. AKS violation can subject perpetrators to both criminal and civil penalties, as well as exclusion from participation in federally-funded health care programs.

53.     The AKS also provides that claims arising out of violations of its provisions are false claims because a claim "that includes items or services resulting from a violation of [the AKS] constitutes a false or fraudulent claim" for purposes of the False Claims Act. 42 U.S.C §1320a-7b(g).

54.     The AKS is designed to ensure that patient care will not be improperly influenced and corrupted by compensation arrangements which are not directly related to the care of patients or which influence patient care decisions.

55.     Unless an exemption applies, payment of remuneration of any kind violates the statute if one of the purposes of the payment is to induce referrals, and remuneration offered or paid in return for the promise to send patients to a particular provider or facility qualifies as a kickback.

56.     The HHS OIG has issued implementing regulations for the AKS, 42 C.F.R. pt. 1001, including safe-harbor exceptions for physician recruiting agreements, 42 C.F.R.

§1001.952(n), which identify circumstances in which individuals or entities may be excluded from participation in federal health care programs for violations of the terms of those programs and of other federal law. 42 C.F.R. §1001.1(a).

57.     The OIG regulations provide a safe harbor from the AKS for remuneration (*i.e.*, payment or the exchange of anything of value) by an entity to induce certain practitioners to locate their primary place of practice into a Health Professional Shortage Area ("HPSA") for their area of medical or health care. 42 C.F.R. §1001.952(n).

58.     With respect to the HPSA aspects of physician recruitment, to qualify for the safe-harbor exception from AKS liability, physician recruitment arrangements also must result in at least 75 percent of the revenues of the new practice being generated from patients residing in a HPSA or a Medically Underserved Area ("MUA") or who are part of a Medically Underserved Population ("MUP") as defined in HHS regulations. *Id.* §§1001.952(n)(8), 1001.952(a)(4).

59.     Although §1001.952(n)(8) broadens AKS's PRA safe harbor to include HPSAs, MUAs, and MUPs designations, and the implementing Stark regulations adopt the AKS provision, 42 C.F.R. §411.357(e)(4)(vii), those designations are irrelevant here because they do not apply to medical specialties such as gastroenterology. The Health Resources and Services Administration ("HRSA") – the HHS agency that designates geographic areas and populations with shortages of certain healthcare providers –implements HPSAs and MUAs/MUPs under §332 and §330(b)(3) of the Public Health Service Act, respectively. 42 U.S.C. §§254e, 254b(b)(3), and has promulgated regulations for HPSAs at 42 C.F.R. pt. 5. HPSAs apply only to certain categories of care (primary care, dental care, mental health care, vision care, podiatric care, pharmacy, and veterinary), *id.*, and the "primary care" category includes only subcategories of primary care not relevant here (general practice, family practice, pediatrics, general internal

medicine or obstetrics/gynecology). 42 C.F.R. pt. 5 app. A ¶I.B.3(a). Similarly, the MUA-MUP provisions apply to non-specialty areas. *See* 42 U.S.C. §254b(b)(1)(A) (defining "required primary health services"). OIG has issued an opinion letter on point, relying on the foregoing authorities and those in Paragraph 60, *infra*, to note that "even if there were a dire shortage of physicians practicing the Specialties within the County, the County could not be designated as a HPSA for the Specialties, because HPSA designations are only available for certain limited primary care specialties." Letter from D. McCarty Thornton, Chief Counsel to the Inspector General, at 10 n.6 (May 3, 2001) (*citing id.* at 8 n.3); *see also id.* at 10 n.7 (*citing* 64 Fed. Reg. 63,518, 63,542 (Nov. 19, 1999)).

60.     The rulemaking record for §1001.952(n)(8) is quite clear that the geographic areas in an HPSA, MUA, or MUP do not extend to all specialties: (a) "This safe harbor is intended to apply only to areas with a demonstrated need for practitioners and only to practitioners who actually serve the residents of such areas," 64 Fed. Reg. at 63,541; (b) "Specifically, the safe harbor applies to recruitment activities where the recruited practitioner's primary place of practice will be located in a *HPSA for the practitioner's specialty area* in accordance with 42 CFR part 5," *id.* (emphasis added); (c) "After carefully reviewing the suggested options, we have concluded that the most sensible approach-one that fairly balances the need to address practitioner shortages with the need to guard against abusive practices-is to extend safe harbor protection to recruitment payments and benefits provided to new and relocating practitioners who establish their primary place of practice in a *HPSA in the practitioner's specialty area* (see discussion of HPSAs above)," *id.* at 63,542 (emphasis added); and (d) "We also concluded that the use of MUAs would create a broader safe harbor than is needed to facilitate the type of practitioner recruitment we intend to protect." *Id.*

61.     To qualify for the safe-harbor exception from AKS liability, physician recruitment arrangements must be set forth in a written agreement signed by the parties that specifies the benefits provided by the entity, the terms under which the benefits are to be provided, and the obligations of each party, *id.* §1001.952(n)(1), with the benefits provided for a period not in excess of three years, during which time the agreement must not be renegotiated in any substantial aspect, *id.* §1001.952(n)(3), and the payment or exchange of anything of value may not directly or indirectly benefit any person – other than the recruited practitioner – or entity in a position to make or influence referrals under a federal health care program to the entity providing the recruitment payments or benefits, *id.* §1001.952(n)(9).

62.     To qualify for the safe-harbor exception from AKS liability, physician recruitment arrangements also must not require referrals to the sponsoring entity, *id.* §1001.952(n)(4), and the benefits must not vary in any way based on the value or volume of any referrals (or business otherwise generated) that is paid in whole or in part by a federal health care program, *id.* §1001.952(n)(6).

**Tennessee Contract Law**

63.     Under Tennessee law, a plaintiff alleging breach of contract must plead sufficient facts to establish "(1) the existence of a contract, (2) breach of the contract, and (3) damages which flow from the breach." *Life Care Centers v. Charles Town Assoc.*, 79 F.3d 496, 514 (6th Cir. 1996).

64.     A contract or amended contract that lacks consideration or provides only illusory promises is void. *Ward v. Sharpe*, 139 Tenn. 347, 349, 200 S.W. 974, 974 (Tenn. 1917); *German v. Ford*, 300 S.W.3d 692, 704 (Tenn. Ct. App. 2009). When part of an agreement's consideration is unlawful, a Tennessee court strikes that part *and anything related to it*. *Spiegel v. Thomas,*

16

*Mann & Smith, P.C.*, 811 S.W.2d 528, 531 (Tenn. 1991).

65.     Under TENN. CODE ANN. §47-2-202, Tennessee allows parol or extrinsic evidence of the parties' intent for "evidence of consistent additional terms" in the absence of an integration clause.

66.     Tennessee contract law also can void an otherwise-valid contract on public-policy grounds: "The authority of the courts to invalidate the bargains of parties on grounds of public policy is unquestioned and is clearly necessary." *Baugh v. Novak*, 340 S.W.3d 372, 382 (Tenn. 2011).

**Tennessee Law of Retaliatory Discharge**

67.     Tennessee recognizes two distinct claims for retaliatory discharge: (a) common-law claims, and (b) statutory claims under the Tennessee Public Protection Act ("TPPA"), TENN. CODE ANN. §50-1-304(b) ("[n]o employee shall be discharged or terminated *solely* for refusing to participate in, or for refusing to remain silent about, illegal activities") (emphasis added).

68.     As signaled by the above-quoted statutory language, the statutory claim requires a discharged employee to prove that his or her refusal to participate in or remain silent about illegal activities was the sole reason for his or her discharge. The common-law claim is broader in that the discharged employee must establish that a reason for his or her discharge was an attempt to exercise a statutory or constitutional right – or for any other reason which violates a clear public policy – and that that protected attempt was a "*substantial factor*" in the employer's decision. *Williams v. City of Burns*, 465 S.W.3d 96, 110-11 (Tenn. 2015) (emphasis added).

## FACTUAL BACKGROUND

**The Nashville Medical Market**

69.     The Hendersonville and Skyline medical centers are all within the Nashville

metropolitan area, but they serve distinct groups of patients.

70.    For 2011 to present, there was no overlap in the contiguous ZIP codes comprising 75% for the Hendersonville and Skyline medical centers. From 2011 to present, the contiguous ZIP codes comprising 75% of the patient base for Skyline Medical Center were two or three of the following three ZIP codes: 37207, 37115, and 37072. From 2011 to present, the contiguous ZIP codes comprising 75% of the patient base for Hendersonville Medical Center were two or three of the following three ZIP codes: 37075, 37066, and 37148.

71.    The GHA Skyline office out of which Dr. Norris and Dr. Gaffney worked for their time at Skyline Medical Center is outside the contiguous ZIP codes comprising 75% for the Hendersonville Medical Center's patient and revenue bases.

72.    The GHA Hendersonville office out of which Dr. Norris and Dr. Gaffney worked for their time at Hendersonville Medical Center is outside the contiguous ZIP codes comprising 75% for the Skyline Medical Center's patient and revenue bases.

73.    HRSA has not designated the Skyline or Hendersonville geographic areas (including without limitation the contiguous ZIP codes comprising 75% for the Hendersonville Medical Center's patient and revenue bases, the contiguous ZIP codes comprising 75% for the Skyline Medical Center's patient and revenue bases, the geographic areas occupied by the GHA Skyline and Hendersonville offices, the Skyline Medical Center, and the Hendersonville Medical Center) as having shortages of gastroenterologists. As explained in Paragraphs 59-60, *supra*, one reason that HRSA has not designated these areas or populations for shortages of gastroenterologists is that HRSA does not designate (or have the statutory authority to designate) shortage populations or geographic areas for medical specialties such as gastroenterology. Also, as a factual matter, there was no shortage of gastroenterologists in the geographic area of Skyline

18

Medical Center. *See* Paragraph 79 *infra*.

**Defendants' Recruitment Program**

74.    To ensure that HCA hospitals can generate revenue by providing medical services, HCA's business model is to recruit physicians – primarily into existing practices – rather than hiring and supporting physicians as employees.

75.    The primary purposes of Defendants' recruiting Dr. Norris and Dr. Gaffney was to increase their respective capacities to do gastroenterology work and to increase referrals for other services and procedures needed by the patients that Dr. Norris and Dr. Gaffney treated.

76.    In 2010, to fill a community need in gastroenterology in the Hendersonville Medical Center's geographic service area, HCA, HCA Physician Services, GHA, and Hendersonville Medical Center actively recruited Maj. William E. Norris, M.D., while he served as Director of Endoscopy at Walter Reed Army Medical Center in Washington, D.C. through telephone calls, facsimiles, emails, and courier packages sent to him at his office.

77.    Between October 14, 2010, and November 8, 2010, HCA, HCA Physician Services, GHA, and Hendersonville Medical Center offered to and finalized with Dr. Norris a PRA to join GHA's existing practice and acquire privileges at Hendersonville Medical Center (the "Norris PRA"). An addendum to the PRA between Dr. Norris, GHA, and Hendersonville Medical Center defined the PRA's obligations with respect to GHA (the "Norris PRA Addendum").

78.    The PRA's financial terms are memorialized in a report prepared by HCA Physician Services on November 10, 2010. In addition to guaranteeing Dr. Norris a salary of $400,000 annually, the PRA provided various incremental start-up overhead (*e.g.*, equipment, a medical assistant, and supplies), start-up expenses (*e.g.*, insurance, furniture, and equipment),

and recruiting-related expenses (*e.g.*, marketing materials and a signing bonus) valued at $160,200 (*i.e.*, $13,350 monthly for the first year), $27,100, and $35,000, respectively. The PRA start-up expenses allocated $60,000 (*i.e.*, $5,000 monthly) for a medical assistant to Dr. Norris.

79.     Prior to Dr. Norris's arrival in the Nashville area in the summer of 2011, several Skyline-based gastroenterologists – including the Nashville Gastrointestinal Specialists practice, as well as Dr. Charles Winter and Dr. Men Zua – were attempting to negotiate emergency room ("ER") call pay with Skyline Medical Center. Once Dr. Norris signed at GHA and was made available for ER call at Skyline Medical Center, the Skyline administration essentially aborted negotiations by offering a below-fair-market contract for ER call pay to the gastroenterologists already available in Skyline Medical Center's geographic service area.

80.     In July 2011, approximately a month before Dr. Norris began work at GHA, GHA presented Dr. Norris with an employment agreement – between Dr. Norris and GHA, but not Hendersonville Medical Center (the "Norris Employment Agreement") – that purported to alter the terms of the Norris PRA Addendum in material respects discussed below. *See also* Paragraphs 119-130, 147-**Error! Reference source not found.**, *infra*.

81.     In 2014, to fill a community need in gastroenterology in the Hendersonville Medical Center's geographic service area, HCA, HCA Physician Services, GHA, and Hendersonville Medical Center actively recruited Dr. Kristin A. Gaffney while she served as Gastroenterology/Hepatology Fellow at Baylor University Medical Center.

82.     As with Dr. Norris, HCA, HCA Physician Services, GHA, and Hendersonville Medical Center offered to and finalized with Dr. Gaffney a PRA to join GHA's existing practice and acquire privileges at Hendersonville Medical Center (the "Gaffney PRA"). An addendum to the PRA between Dr. Gaffney, GHA, and Hendersonville Medical Center defined the PRA's

obligations with respect to GHA (the "Gaffney PRA Addendum").

83.    As with Dr. Norris, in the summer of 2015, GHA presented Dr. Gaffney with an employment agreement – between Dr. Gaffney and GHA, but not Hendersonville Medical Center (the "Gaffney Employment Agreement") – that purported to alter the terms of the Gaffney PRA Addendum in material respects discussed below.

**Implementing the PRAs outside the Stark and AKS Safe Harbors**

84.    Because the Stark and AKS exceptions for PRAs (like other exceptions) are safe harbors, physicians and entities who seek to rely on the safe harbor bear the burden of proving their full compliance with the safe harbor's terms and, failing to make that showing, fall outside the safe harbor and, thus, in violation of the Stark Law or AKS.

85.    Further, although the Stark Law's safe harbor requires recruited physicians to serve at least 75% of their time in the recruiting hospital's geographic service area, GHA required Dr. Norris and Dr. Gaffney to spend well in excess 25% of their time at Skyline Medical Center, outside the geographic service area for Hendersonville Medical Center. For example, GHA directed Dr. Norris to spend over 50% of his ER call and over 30% of his office time at Skyline Medical Center, with the result that Dr. Norris spent over 40% of his time outside the Hendersonville Medical Center's geographic service area. Dr. Gaffney divided her time in a similar manner, with over 30% of her time spent at Skyline Medical Center, outside the Hendersonville Medical Center's geographic service area.

86.    By supplanting the local gastroenterologists negotiating ER gastroenterology call coverage at Skyline Medical Center, *see* Paragraph 79, *supra*, with Dr. Norris and then Dr. Gaffney, Defendants were able to – and intended to – increase their referrals, procedures, and revenues at Skyline Medical Center, while essentially paying Dr. Norris and then Dr. Gaffney no

additional income for the excessive additional hours because the Norris and Gaffney PRAs capped the recruited physicians' salaries at the PRAs' salary guarantee, with any additional income rebated back to the recruiting hospital.

87.     Although Henderson Medical Center, GHA, and the recruited physicians agreed in the Norris and Gaffney PRA Addenda that the recruited physicians may not enter non-compete or similar practice restrictions – except conditions related solely to quality of care or as referenced in 72 Fed. Reg. 51,012, 51,053 (Sept. 5, 2007) – GHA included a non-compete clause in the Norris and Gaffney Employment Agreements, conflicting not only with the Stark and AKS safe harbors that require that all parties sign any agreement – Hendersonville Medical Center did not sign this purported amendment – but also with the AKS safe harbor precluding the renegotiation of any substantial aspect of a PRA.

88.     Although the AKS safe harbor is limited to PRAs no longer than three years, the Norris and Gaffney PRAs were for four-year periods.

89.     Under the Norris and Gaffney PRAs, the HCA defendants would transfer not only the physician's salary guarantee but also the incremental practice overhead expenses – up to $13,500 per month for Dr. Norris – to GHA, out of which GHA paid Dr. Norris's salary. GHA reported monthly incremental overhead to HCA to support the recruited physicians on the HCA Form IGAP-003. Relator lacks information on whether GHA either received the full amount (*i.e.*, $13,500 per month for Dr. Norris) and kept the unspent balance for itself or instead simply did not incur certain expenses, which thus remained off the monthly Form IGAP-003 reports submitted to HCA for reimbursement. Either way, GHA did not spend available PRA start-up funding on technology or a medical assistant for Dr. Norris that would have supported his practice adequately and avoided any of the arrearages in medical records that allegedly led GHA

Case 1:16-cv-02155-APM  Document 56  Filed 07/11/19  Page 23 of 42

to terminate Dr. Norris. Whether "pocketed" by GHA or simply left "on the table" and unclaimed at HCA, GHA failed to allocate over $100,000 of the $160,200 in start-up expenditures that the PRA allocated to get Dr. Norris's practice going.

90.     In June of 2012, Dr. Norris had conversations with Hendersonville Medical Center's Chief Operating Officer, Michael Morrison, initially regarding Dr. Norris's need to repay that hospital collections in excess of Dr. Norris's income guarantee in the Norris PRA. During these conversations, Dr. Norris that the excess collections resulted from his taking ER call coverage on average eight (8) days/nights a month call on average fifteen (15) days a month at Skyline Medical Center, which was not included in the Norris PRA.

91.     On or about October 1, 2012, GHA provided Dr. Norris with a partnership offer, which Dr. Norris declined to sign until after he could review the medical practice books as well as a third-party medical practice audit, which ultimately was conducted by the Henderson Financial Group but not shown to Dr. Norris, even though he paid one third of the audit's cost.

92.     In April 2013, Dr. Norris and HCA Physician Recruiting had a discussion about Dr. Norris's professional plans, in which they discussed how the Norris PRA earmarked $60,000 for incremental overhead in the form of medical staff support and benefits during the Norris PRA's first year (September 2011-August 2012), and Dr. Norris indicated that he did not receive any staff support until March 2013, when he took the initiative to hire staff.

93.     On or about May 17, 2013, and effective on or about May 24, 2013, GHA terminated Dr. Norris, but the HCA Defendants did not release him from obligations to the HCA entities under the terms of the Norris PRA.

94.     Although Dr. Norris would have preferred to leave the Nashville area, the HCA Defendants refused his request – through this then-counsel – to negotiate either a termination to

or a revision of the Norris PRA. His then-counsel advised him that he had to remain in the area
and open his own practice to fulfil his PRA obligations to the HCA entities under remaining time
left of the four-year term of the Norris PRA.

95.     Opening a practice required Dr. Norris to incur significant expenses, including
not only the cost and depreciation of office space and fixtures but also tax penalties for early
withdrawal of retirement accounts that he used to fund that effort.

96.     GHA and Dr. Norris engaged in state-law litigation over whether GHA's
termination of Dr. Norris was pretextual or otherwise unlawful in two prior cases: (a) *Norris v.
Gastroenterology and Hepatology Associates, PLLC*, No. 83CC1-2014-CV541 (Sumner Cty.
Tenn.); and (b) *Mission Gastroenterology v. Gastroenterology & Hepatology Associates*, No:
3:14-cv-1613 (M.D. Tenn.). The Sumner County case pitted Dr. Norris's claims state-law claims
(primarily, breach of contract and retaliatory discharge) against GHA counterclaims (i.e., breach
of contract and fiduciary duties, overlapping reputational tort claims); the parties jointly
nonsuited the Sumner County case pursuant to TENN. R. CIV. P. 41.01, effective January 5, 2018.
The prior federal suit sought to enforce the Stark Law directly and was dismissed for lack of
subject-matter jurisdiction in 2015 because the Stark Law does not provide for a private cause of
action and the parties were not diverse. *Mission Gastroenterology*, No: 3:14-cv-1613, at 4 (M.D.
Tenn. July 22, 2015).

97.     On May 19, 2014, Dr. Norris wrote Hendersonville Medical Center's Chief
Executive Officer ("CEO") – who had signed the Norris PRA for the medical center – to void
the PRA for various reasons, including (a) GHA's retaining the $60,000 that the PRA allocated
to incremental medical staff support for Dr. Norris, and (b) the excessive time at Skyline
Medical Center outside Hendersonville Medical Center's geographic service area under the

Stark Law regulations.

98.    On June 5, 2014, an outside counsel for HCA and Henderson Medical Center responded to Dr. Norris by indicating that there was no basis for rescinding the PRA and forwarding a purported assignment agreement dated June 5, 2013, by the Skyline Medical Center CEO and July 31, 2013, by the Henderson Medical Center CEO, with the following explanation:

> Hendersonville assigned the recruitment agreement to Skyline. A copy of the assignment is attached. Although the attached copy does not bear your signature, your prior counsel, Mr. Kinslow, approved the assignment and Hendersonville and Skyline signed it based on such approval. It is clear that the assignment was done with your consent and at your request and that you agreed to practice (and did practice) in Skyline's area. You may sign the document to memorialize your consent. Moreover, please note that Paragraph 17 of the recruitment agreement allowed Hendersonville to assign the contract even without your consent.

Assuming *arguendo* that the HCA entities indeed created and signed the assignment circa the summer of 2013 as they claim – as opposed to creating it and backdating in the summer of 2014 – the HCA entities did not provide a copy to Dr. Norris until June 5, 2014. In any event, the purported assignment is ineffective for several reasons: (a) it was not signed by Dr. Norris, in violation of the Stark and AKS safe harbors that all parties sign a PRA, assuming that PRAs indeed can be amended; (b) the assignment purports to renegotiate a substantial aspect of the PRA, in violation of the AKS safe harbor; (c) as amended by the purported assignment, the PRA would remain absolutely the same in all material aspects (*i.e.*, whether the PRA is assigned to a hospital in Nashville or Alaska, Dr. Norris's obligation under the PRA would remain his original duties to the Henderson Medical Center); (d) assuming *arguendo* that one hospital could assign a recruited physician to another hospital, the 60%-40% split in Dr. Norris's time with the Hendersonville and Skyline medical centers would remain in noncompliance with the Stark safe harbor's requirement to work 75% of his time in the assignor, even if the assignment could cure

the Stark Law non-compliance vis-à-vis the assignee; and (e) the assignment incorrectly relies on the Skyline Medical Center's falling within an area of medical shortage. *See* Paragraphs 59-60 and 73, *supra*.

99.     As described in Paragraphs 90-98, *supra*, Defendants were on notice from their interactions with Dr. Norris that Skyline Medical Center was outside of Hendersonville Medical Center's geographic service area for purposes of the Stark Law's PRA safe harbor, but recruited Dr. Gaffney for Hendersonville Medical Center into the existing GHA practice, and repeated the same Stark Law violation with Dr. Gaffney.

**False Claims and Kickbacks**

100.    The primary reason that Defendants violated the False Claims Act is that the PRAs did not meet the Stark and AKS safe harbors for PRAs, thus rendering all transactions for the affected physicians, practice, and hospitals – namely, all consults, procedures, referrals, lab work, and any ancillary services – tainted by impermissible self-referrals and kickbacks.

101.    Each year since 2011 and continuing through the filing of the original Complaint, the Hendersonville and Skyline medical centers submitted Hospital Cost Reports that represented compliance with Medicare regulations and laws, including the Stark Law and AKS.

102.    Based on the facts alleged herein, the Hendersonville and Skyline medical centers appear to have been aware since 2011, but in any event became aware in 2013-14, of the improper PRA arrangements alleged here, and continued to retain the claims originally made to Medicare. Either because the Hendersonville and Skyline medical centers were aware of their false claims when originally made or because the Hendersonville and Skyline medical centers became aware of the falsity of those claims and failed to correct those claims, the Hendersonville and Skyline medical centers submitted Hospital Cost Reports that *falsely* represented compliance

with Medicare regulations and laws, including the Stark Law and AKS. In light of the foregoing, each CMS Form 1450 (UB-04) and CMS Form 2552 submitted by the Hendersonville and Skyline medical centers was a false claim.

103.    Similarly, the CMS Form 1500s submitted by Defendants during the period from September 1, 2011 to July 31, 2015, for Dr. Norris, and from September 1, 2015 to present for Dr. Gaffney also falsely certified compliance with federal health care programs, including the Stark Law and AKS.

104.    Although Defendants submitted hundreds of false claims for specific consults, procedures, referrals, lab work, and ancillary services to be determined through discovery, *see* Paragraph 117, *infra*, the false claims include without limitation patient care on May 18, 2013, at Skyline Medical Center for medical record numbers 215150, 833241, and 623473, and on January 3, 2012, at Henderson Medical Center for Medicare number 309461607A.

**Harms to the United States from the Defendants' Illegal Conduct**

105.    Congress legislated against self-referral and kickbacks in federal health care programs both to control costs – vis-à-vis fraud – and to preserve the patient-physician relationship, which can be eroded by financially self-interested transactions (*e.g.*, unnecessary tests, less-than-qualified referrals). Preserving the economic independence and patient-centered focus of the ideal physician-patient relationship furthers these important federal goals. Conversely, violations of the Stark and AKS safe harbors – and thus the Stark Law and AKS – implicate these important federal interests and warrant this Court's intervention.

106.    HHS's OIG has warned "improper recruitment arrangements" pose a "significant risk of fraud and abuse," which "hospitals should scrutinize … with care," and that "hospitals should be aware that the practitioner recruitment safe harbor excludes any arrangement that

directly or indirectly benefits any existing or potential referral source other than the recruited physician" that "the safe harbor does not protect 'joint recruitment' arrangements between hospitals and other entities or individuals, such as … group practices …, pursuant to which the hospital makes payments directly or indirectly to the other entity or individual" because "[t]hese joint recruitment arrangements present a high risk of fraud and abuse." 70 Fed. Reg. 4858, 4868 (2005). Accordingly, "Hospitals should review all 'joint recruiting' arrangements to ensure that remuneration does not inure in whole or in part to the benefit of any party other than the recruited physician." *Id.*

107.     More specifically, allowing recruited physicians to work outside the medical need that warranted their federally subsidized relocation via the Stark and AKS exceptions harms the patients in the geographic area to which the physician was recruited.

108.     Further, misaligning physicians for economic self-interest as opposed to patient care diverts scarce physicians from where they are needed, which is especially true in the field of gastroenterology due to a looming physician shortage from an aging population.

109.     For all these reasons, false certifications of compliance with federal health care programs that seek to hide Stark and AKS violations are especially serious to the United States and universally warrant strict enforcement because of the materiality of the certification (and Stark and AKS compliance) to the financial and ethical viability of these federal programs.

**Factors that Exacerbate the Defendants' Culpability**

110.     HCA is a repeat (and serious) violator of False Claims Act, with penalties of $731 million in 2000, $631 million in 2003, and at least four settlements announced between 2012 and 2015 on the Department of Justice's website.

111.     HCA's 10(k) annual report filed with the Security & Exchange Commission

("SEC") cavalierly suggests that compliance is difficult: "it is unclear how the government will interpret many of these exceptions for enforcement purposes" and "we do not always have the benefit of significant regulatory or judicial interpretation of the Stark Law and its implementing regulations;" thus while "[HCA entities] attempt to structure our relationships to meet an exception to the Stark Law, … the regulations implementing the exceptions are detailed and complex, and we cannot assure that every relationship complies fully with the Stark Law." HCA Holdings, Inc., Form 10-K, at 20-21 (Feb. 26, 2016); HCA Holdings, Inc., Form 10-K, at 21 (Feb. 22, 2017); HCA Healthcare, Inc., Form 10-K, at 19 (Feb. 23, 2018). Neither HCA nor its constituent entities nor GHA sought an advisory opinion in connection with the PRAs at issue, notwithstanding that Dr. Norris raised the FCA compliance issue with them both in conversation and communications and in *Mission Gastroenterology*. *See* Paragraph 96, *supra*.

112.    Although the HCA defendants were generally on notice of the need to scrutinize joint recruiting arrangements through practice groups like GHA because of the high risk of fraud through payments' inuring to the practice group, 70 Fed. Reg. at 4868, and specifically on notice that GHA had indeed retained significant portions of the incremental overhead allocated to help recruited physicians set up their practice at Hendersonville Medical Center, the HCA defendants elected both (a) to engineer a synthetic transfer from Hendersonville Medical Center to Skyline Medical Center, *see* Paragraph 98, *supra*, rather than self-report the Stark and AKS violations, and (b) to continue to certify continuing compliance on their Hospital Cost Reports (CMS-2552).

113.    Engaging in deceit and covering up past violations evidences intent with respect not only to the cover up itself but also to the original violation.

114.    In addition to the various missed opportunities that Defendants had to correct their False Claims Act violation with respect to the Norris PRA, the Defendants "doubled down"

by replicating the same violations with respect to the Gaffney PRA.

**Allegations regarding Specific False Claims**

115.    Defendants' fraudulently claiming and keeping money has two components under the False Claims Act, Stark Law, and AKS: (1) the improperly executed PRAs outside the Stark Law and AKS safe harbors for PRAs, and (2) the specific amounts claimed from the federal government while in violation of the Stark Law and AKS. The improper PRAs in the first component make each claim submitted in the second component unlawful, even if the claims would otherwise have been lawful, in the absence of the improper PRAs.

116.    Consistent with FED. R. CIV. P. 9(b), Relator pleads Defendants' fraud respecting the improper PRAs with particularity, *see* Paragraphs 84-99, *supra*, but Relator would require discovery to plead fully the specifics of each specific individual claim that Defendants unlawfully submitted to the United States and unlawfully retained because the particular procedures, invoices, and other information needed to plead each false claim with particularity are private patient records exclusively in the possession of Defendants and the United States, as well the individual patients.

117.    From Dr. Norris's own knowledge, Defendants submitted – and then subsequently retained the funds for – hundreds of claims to Medicare for payment in amounts ranging from below a hundred dollars to over ten thousand dollars each, over the periods covered by the improper PRAs. Pursuant to FED. R. CIV. P. 11(b)(3), Relator states on information and belief, formed after reasonable inquiry, which certainly could be confirmed with the opportunity for discovery of Defendants' billing database or the United States' claims database, that a definite claim could be stated with particularity as to the number of false claims, their dates, and their amounts. In addition to that claim on information and belief, Relator also identifies several

specific false claims in Paragraph 104, *supra*.

118.   The full universe of false claims would be all the Medicare claims submitted by Defendants during the periods covered by the improper PRAs (namely, September 1, 2011, to the present).

**GHA's Breach of State-Law Obligations**

119.   In *Mission Gastroenterology,* the parties nonsuited their respective claims and counterclaims effective January 5, 2018, which TENN. R. CIV. P. 41.01 provides one year to refile, which can be accomplished via a motion to amend a complaint. *Frazier v. E. Tenn. Baptist Hosp., Inc.*, 55 S.W.3d 925, 930 (Tenn. 2001). Because January 5, 2019, fell on a Saturday, the deadline to refile extends to the next court day, TENN. R. CIV. P. 6.01; FED. R. CIV. P. 6(a)(1)(C).

120.   Even without the Stark Law and AKS overlays onto the GHA-Norris employment agreement, the position that GHA advertised and described to Dr. Norris was "for a 5-way shared call arrangement" at a "State-of-the-Art suburban hospital" with "Convenient office space located in brand new Medical Office Building on campus of hospital," (flyer attached), which describes GHA's Hendersonville position, but not its Skyline position.

121.   None of the Defendants ever mentioned required work at Skyline as part of recruiting Dr. Norris.

122.   The Norris PRA's integration clause applies by its terms only to the "Hospital" and the "Physician," which the PRA defines as Hendersonville Medical Center and Dr. Norris, respectively; the PRA refers to GHA as the "Practice." No integration clause in either the Norris PRA or the Norris PRA Addendum applies to GHA. Indeed, ¶3(A)(i) of Norris PRA Addendum (PRA, at 18) expressly contemplates that Dr. Norris and GHA had separately reached agreement with respect to salary and benefits.

123.     In signing that Norris PRA Addendum, GHA acknowledged a contemporaneous contractual relationship outside the PRA. While parties in Dr. Norris's and GHA's position will typically enter a contemporaneous written employment agreement, GHA did not require that, at least until more than six months later when GHA sprung a purported employment agreement on Dr. Norris after he already had resigned his commission in the Army and had begun the process of moving to Tennessee for his new job.

124.     While under normal circumstances it likely would constitute consideration for an existing medical practice to offer even an at-will job to a new doctor, GHA already had offered a job and Dr. Norris already had accepted that job. As such, offering Dr. Norris a job in a July 2011 agreement that Dr. Norris already had under a November 2010 agreement was no consideration at all.

125.     All the other consideration that the Norris Employment Agreement purports to provide Dr. Norris was illusory:

(a)     *Salary*. ¶3(A) of the Norris Employment Agreement addressed Dr. Norris's salary: "During the term of this Agreement, Physician shall be paid, as his base compensation, an amount calculated in accordance with Exhibit A attached hereto." The PRA and the contemporaneous employment agreement between GHA and Dr. Norris already contemplated salary: "the salary and customary benefits paid to, or incurred on behalf of, Physician by Practice (which the parties agree and have verified represents fair market value for Physician's specialty in the community)." PRA, at 18 (¶3(A)(i) of Norris PRA Addendum). The Norris Employment Agreement did not give Dr. Norris a salary commitment that he did not already have when the parties signed the PRA.

(b)     *Professional Memberships*. ¶3(G) of the Norris Employment Agreement addressed

professional-membership fees: "The Company will pay such dues for Physician's membership in local, state and national medical associations, Physician's Tennessee licensure fees, and Physician's hospital staff dues up to a maximum amount of $1,500.00 during each Employment Year." During the Norris Employment Agreement's one-year term, however, the PRA covered professional dues and subscriptions, and GHA expensed these payments to HCA.

(c)   ***Malpractice***. ¶3(H) of the Norris Employment Agreement addressed malpractice insurance under some circumstances: "Provided that Physician is insurable at rates reasonably acceptable to Company, Company shall maintain malpractice insurance covering Physician with limits of not less than One Million Dollars ($1,000,000.00) per person and Three Million Dollars ($3.000,000.00) yearly aggregate." During the Norris Employment Agreement's one-year term, however, the PRA covered malpractice insurance, and GHA expensed these payments to HCA.

(d)   ***Fringe Benefits***. ¶3(I) of the Norris Employment Agreement addressed fringe benefits: "Physician shall be entitled to participate in such other fringe benefits as the Company offers to other like employees, including any qualified pension or profit sharing plan, health insurance plan or similar benefit in accordance with the terms of each plan." During the Norris Employment Agreement's one-year term, however, the PRA covered "Physician Benefits," and GHA expensed HCA for Blue Cross/Blue Shield payments for family dental, medical, and life insurance. GHA did not have any other fringe benefits; indeed, GHA did not have any "other like employees" (*i.e.*, physician employees) because GHA's other physicians owned the practice.

126.   In addition to being void for lack of consideration, the Norris Employment

Agreement also is void as against public policy – or simply preempted – due to the violations of relevant federal law such as the Stark Law and AKS:

(a)   ***Signed Agreements and Specificity***. Under the Stark regulations, all parties must sign PRAs, including any existing medical practice that recruits a physician. 42 C.F.R. §411.357(e)(1)(i), (e)(4)(i). Similarly, under the AKS safe harbor, all parties must sign PRAs, and the PRA must specify the benefits provided by the entity, the terms for providing those benefits, and each party's obligations. 42 C.F.R. §1001.952(n)(1).

(b)   ***Renegotiations***. The AKS regulations prohibit renegotiating a PRA in any substantial aspect. 42 C.F.R. §1001.952(n)(3).

(c)   ***Geographic Scope***. The AKS regulations require that at least 75 percent of the revenues come from patients residing in one of several types of targeted areas, as defined in the implementing regulations. 42 C.F.R. §§1001.952(n)(8), 1001.952(a)(4). Similarly, the Stark Law requires recruited physicians to spend 75 percent or more of their focus in the recruiting hospital. Herb B. Kuhn, Director, Center for Medicare Management, Dep't of Health & Human Services, Advisory Opinion No. CMS-AO-2006-01, at 5 (2006); 42 C.F.R. §411.357(e)(2)(i).

Even if the Norris Employment Agreement somehow provided consideration of some sort, that would not mean that the Norris Employment Agreement's integration clause authorized Dr. Norris's work at Skyline. GHA could not lawfully authorize, much less command, Dr. Norris to spend more than a quarter of his time away from Hendersonville.

127.   While Dr. Norris worked there, GHA's Skyline office at which GHA directed Dr. Norris to work lacked reliable internet access and other technology needed to enter electronic medical records and lacked a medical assistant. Even at GHA's Hendersonville office, GHA

34

medical assistants prioritized their work for Drs. Randy Howard and Scott Hande (who are the LLC members and owners) over any work for Dr. Norris. Both because he did a greater percentage of his own work – due to the lack of a medical assistant – and because he was busier than Drs. Howard or Hande, Dr. Norris did not have enough time to accomplish the full range of his tasks, most notably manifested by falling behind in the entry of medical records, although he had the underlying notes and paper records.

128.   GHA's reason stated for terminating Dr. Norris's employment in May 2013 – namely, his "continuing failure to complete all patient medical records and hospital records in a timely basis" – is the result of GHA's own unlawful assignment of Dr. Norris to spend more than 25% of his time at GHA's Skyline office for work at Skyline Medical Center and its compelling him to work without adequate support from staff. It is an industry standard for gastroenterologists with Dr. Norris's schedule, practice, and skillset to have a medical assistant. After Dr. Norris prevailed on GHA to hire staff in March of 2013, Dr. Norris was able to keep up with his patient and hospital records prospectively.

129.   Although Dr. Norris may possess enough facts to assert a claim for retaliatory or pretextual discharge, Relator does not view such a claim as entitling the bankruptcy estate to significantly more of a tort recovery than would be available for a successful contract claim. Because a successful retaliatory-discharge claim would require a full trial on contested fact issues – whereas a successful contract claim should be resolved by summary judgment – Relator does not separately plead a count for retaliatory discharge. If this matter goes to trial, the other relief requested in Paragraph 153.H, *infra*, could include damages for retaliatory discharge in the event that Dr. Norris reassumes control of this litigation upon the discharge of his bankruptcy or the retaliatory-discharge issue is litigated by consent or via an amended complaint. FED. R. CIV.

P. 15(a)-(c), 54(c).

130.    To the extent that GHA's termination of Dr. Norris was both justified and not retaliatory under Tennessee law, Dr. Norris was only present in the Skyline Medical Center without adequate technology or support staff because of GHA's bait-and-switch recruiting and its failure to take advantage of the PRA's start-up funding for support staff and technology (*i.e.*, the breach of contract asserted here). Thus, even if discharging Dr. Norris were justified under the law of retaliatory discharge, the underlying fault would nonetheless lie with GHA under the law of contracts.

## COUNT I
### FALSE CLAIMS ACT: PRESENTATION OF FALSE CLAIMS

131.    Relator incorporates Paragraphs 1-130 and 134-153 as if fully set forth herein.

132.    In violation of 31 U.S.C. §3729(a)(1)(A), Defendants knowingly presented or caused to be presented false or fraudulent claims for payment or approval to the United States, including claims for reimbursement for services rendered to patients unlawfully referred to HCA and GHA facilities by physicians to whom Defendants provided kickbacks and/or illegal remuneration in violation of the Stark Law and Anti-Kickback Statute.

133.    By virtue of the false or fraudulent claims made by the Defendants, the United States suffered damages and therefore is entitled to multiple damages under the False Claims Act, to be determined at trial, plus a civil penalty of $5,500 to $11,000 for each violation, as adjusted by FCPIA.

## COUNT II
### FALSE CLAIMS ACT: MAKING OR USING FALSE RECORD OR STATEMENT TO CAUSE CLAIM TO BE PAID

134.    Relator incorporates Paragraphs 1-133 and 137-153 as if fully set forth herein.

135.     In violation of 31 U.S.C. §3729(a)(1)(B), Defendants knowingly made, used, or caused to be made or used, false records or statements – *i.e.*, the false certifications and representations made or caused to be made by Defendants when initially submitting the false claims for interim payments and the false certifications made or caused to be made by Defendants in submitting the cost reports – to get false or fraudulent claims paid or approved by the United States.

136.     By virtue of the false records or false statements made by the Defendants, the United States suffered damages and therefore is entitled to treble damages under the False Claims Act, to be determined at trial, plus a civil penalty of $5,500 to $11,000 for each violation, as adjusted by FCPIA.

## COUNT III
## FALSE CLAIMS ACT: MAKING OR USING FALSE RECORD OR STATEMENT TO AVOID AN OBLIGATION TO REFUND

137.     Relator incorporates Paragraphs 1-136 and 140-153 as if fully set forth herein.

138.     In violation of 31 U.S.C. §3729(a)(1)(G), Defendants knowingly made, used or caused to be made or used false records or false statements – *i.e.*, the false certifications made or caused to be made by Defendants in submitting the cost reports – to conceal, avoid or decrease an obligation to payor transmit money or property to the United States.

139.     By virtue of the false records or false statements made by the Defendants, the United States suffered damages and therefore is entitled to treble damages under the False Claims Act, to be determined at trial, plus a civil penalty of $5,500 to $11,000 for each violation, as adjusted by FCPIA.

## COUNT IV
## FALSE CLAIMS ACT: CONSPIRING TO SUBMIT FALSE CLAIMS

140.   Relator incorporates Paragraphs 1-139 and 144-153 as if fully set forth herein.

141.   In violation of 31 U.S.C. §3729(a)(1)(C), Defendants entered into agreements with certain physicians and each other and conspired to defraud the United States by submitting false or fraudulent claims for reimbursement from the United States for monies to which they were not entitled.

142.   As part of schemes and agreements to obtain reimbursement from the United States in violation of federal laws, Defendants conspired to provide kickbacks and illegal compensation to physicians in violation of the Anti-Kickback Statute and Stark Law, and to cause the United States to pay claims for health care services based on false claims and false statements that the services were provided in compliance with all laws regarding the provision of health care services when they were not so provided.

143.   By virtue of Defendants' conspiracy to defraud the United States, the United States suffered damages and therefore is entitled to treble damages under the False Claims Act, to be determined at trial, plus a civil penalty of $5,500 to $11,000 for each violation, as adjusted by FCPIA.

## COUNT V
## STARK LAW: ENTERING IMPROPER ARRANGEMENTS

144.   Relator incorporates Paragraphs 1-143 and 147-153 as if fully set forth herein.

145.   In violation of 42 U.S.C. §1395nn(g)(4), Defendants knowingly entered into improper PRAs and other arrangements with certain physicians and each other with a principal purpose of assuring referrals to the Defendants in violation of 42 U.S.C. §1395nn.

146.   By virtue of Defendants' unlawful arrangements, the United States suffered

Case 1:16-cv-02155-APM   Document 56   Filed 07/11/19   Page 39 of 42


damages and therefore is entitled to treble damages under the False Claims Act, to be determined at trial, plus a civil penalty of $100,000 for each violation, as adjusted by FCPIA.

## COUNT VI
## BREACH OF CONTRACT AGAINST GHA

147.    Relator incorporates Paragraphs 1-146 and 153 as if fully set forth herein.

148.    Contemporaneously with the entry of the Norris PRA Addendum, GHA and Dr. Norris entered a contract to employ Dr. Norris to practice with GHA at Hendersonville Medical Center for no less than 75 percent of his time (*i.e.*, GHA had agreed to employ Dr. Norris in the fall of 2010, without the need for GHA and Dr. Norris to enter into the Norris Employment Agreement in July 2011). Alternatively, even if GHA and Dr. Norris did not enter a contract prior to July 2011, they entered an employment contract via the Norris Employment Agreement, albeit the terms of that alternative contract were preempted or otherwise modified by the public policy prohibiting GHA to violate the Stark Law and AKS as set forth herein (*i.e.*, GHA lacked contractual authority to compel or allow Dr. Norris to work more than 25 percent of his time outside Hendersonville Medical Center). Under either alternative, GHA and Dr. Norris has a valid employment contract that prohibited GHA to compel or allow Dr. Norris to work more than 25 percent of his time away from Hendersonville Medical Center.

149.    GHA breached its employment contract with Dr. Norris by compelling him to work without sufficient staff or technological support at Skyline for more than 25% of his time and by making him work extra time by splitting between Hendersonville and Skyline, all contrary to the advertised job at a "State-of-the-Art suburban hospital" with a "a 5-way shared call arrangement" and in violation of the Stark Law and AKS.

150.    GHA's breach of contract damaged Dr. Norris primarily by terminating his

annual salary ($400,000) more than two years before the end of the PRA's four-year term, but also – because the PRA compelled him to continue to support the HCA defendants – by forcing him to start up and run his own medical practice in the Nashville to meet his PRA obligations during the balance of the post-termination portion of the PRA's four-year term.

151.    Alternatively to a contract claim, the Court could regard this Count as asserting a claim for common-law retaliatory discharge in the sense that GHA set Dr. Norris up to fail by making it impossible for him to complete his tasks not only by compelling him to work extra hours but also by denying him the staff support and – at Skyline – the technical support that are industry standards and that – in the critical first year – the PRA would have funded. Viewed in this light, the substantial factor for which GHA claims to have terminated Dr. Norris – namely, the suspensions – were the result of GHA's own actions – both unlawful and negligent – to set Dr. Norris up to fail by denying him sufficient staff and technological support.

152.    By virtue of GHA's breach of a valid employment contract, Dr. Norris – now, his bankruptcy estate – suffered damages including not only lost salary for the post-termination balance of the PRA's four-year term but also the expense to set up and run a stand-alone practice to complete his PRA obligation to the HCA defendants during the post-termination balance of the PRA's four-year term.

## PRAYER FOR RELIEF

153.    WHEREFORE, Relator, on behalf of itself and the United States Government, prays for the following relief:

A.    That this Court enter judgment against Defendants in an amount equal to three times the amount of actual damages the United States Government has sustained because of Defendants' actions, plus a civil penalty of $5,500 to $11,000 – as adjusted by

FCPIA – for each action in violation of 31 U.S.C. §3729, and the costs of this action, with interest, including the costs of the United States for its expenses related to this action;

B.      That this Court award contract damages in favor of Relator against GHA in an amount to be proved, consisting of the lost post-termination salary for the balance PRA's full four-year term, plus any and all expenses incurred to start or support Dr. Norris's own practice to complete his PRA obligations to the HCA defendants during the PRA's four-year term, less the salary and other compensation received for practicing medicine that Dr. Norris received during the post-termination portion of the PRA's four-year term;

C.      That the Relator be awarded all costs incurred, including – for the federal claims – reasonable attorneys' fees;

D.      That, if the United States Government takes over this action, the Relator be awarded an amount for bringing this action of at least 15% but not more than 25% of the proceeds of the action or settlement for the federal claims;

E.      That, in the event the United States does not proceed with this action, the Relator be awarded an amount that the Court decides is reasonable for collecting the civil penalty and damages, which shall not be less than 25% nor more than 30% of the proceeds of the action or the settlement for the federal claims;

F.      That the Relator be awarded prejudgment interest;

G.      That a trial by jury be held on all issues; and

H.      That the United States Government and Relator be awarded such other relief, both in law and in equity, to which they may reasonably appear entitled.

Dated: January 7, 2019                    Respectfully submitted,


                                          /s/ Lawrence J. Joseph

                                          Lawrence J. Joseph, D.C. Bar No. 464777

                                          1250 Connecticut Ave. NW, Suite 700-1A
                                          Washington, DC 20036
                                          Tel: 202-355-9452
                                          Fax: 202-318-2254
                                          Email: ljoseph@larryjoseph.com

                                          *Counsel for Relator*